[L. A. No. 14673. In Bank.—September 10, 1936.]

In the Matter of the Estate of LORENZO B. WRIGHT, Deceased. CHARLOTTE JOSEPHINE HINDMARCH, Appellant, v. MAUD WRIGHT ANGELL, Respondent.

Stewart & Stewart for Appellant.

McKenna & McKenna, Catherine A. McKenna and J. Irving McKenna for Respondent.

SEAWELL, J.—The petition for admission to probate of the will of Lorenzo B. Wright, deceased, having been denied on the ground of testamentary incapacity, the executrix named in said will herewith appeals to this court. The grounds urged for reversal are that the evidence is insufficient to sustain the judgment and order. The complaint also alleged the exercise of undue influence, but the probate court decided that issue against contestant. The appeal is presented on a bill of exceptions as per stipulation by the parties and contains the evidence which bears upon the testator's mental capacity. Respondent has not filed a reply brief.

The testator, Lorenzo B. Wright, died at Venice, California, May 2, 1933, at the age of sixty-nine years. Maud Wright Angell, the contestant, is his daughter and the nearest of kin. He left no other children. Alma H. Angell is the husband of testator's daughter Maud. Two children constitute the issue of this marriage. Testator's wife died in 1921. We mention thus early a fact which may throw some light on certain acts of testator that were stressed by the several witnesses for contestant, which is that for a number of years he was engaged in driving a garbage wagon in the city of Venice. The evidence is silent as to whether it was a private enterprise or whether he was in the employ of the city.

The decedent left an estate consisting of two improved parcels of land situated in Venice, California, and an interest in an estate situated in Salt Lake City, his former home, and some inconsequential personal property of unknown value. The petition for probate alleges that the total value of his estate does not exceed the sum of $10,000. His will was formally executed one year and four months prior to his death. By its terms he devised to Charlotte Josephine Hindmarch, fifty years of age and whom he describes as his friend, his house located at 722 Nowita Place and all his personal "belongings, monies, collateral, notes or anything of value"; he devised to his daughter, the contestant herein, the house located on lot nine, at 724 Nowita Place, and to his granddaughter, Marjorie Jean Angell, his interest in an estate in Salt Lake City. He gave to his grandson, his son-in-law and several other persons, relatives or friends, one dollar each.

We have in this proceeding the unusual spectacle of the drawer of the will, a notary public and realtor, and the two subscribing witnesses testifying that they were of the opinion that the testator was of unsound mind. The testimony of these three witnesses, like the testimony given by all the others, is far too weak and unsubstantial to support the judgment. To a great extent the grounds upon which the witnesses base their opinions are mere trivialities. If it could be said that the testimony of the three persons who participated in the creation of the will and who by their solemn acts gave the stamp of approval and verity to its due execution, and afterwards attempted to repudiate all they had done, had any convincing force or any substantial factual basis, their testimony would nevertheless be subject to the scrutiny and suspicion which courts rightfully exercise in considering the testimony of persons who out of their own mouths admit their guilt of self-stultification. It has been said that such testimony is "simply worthless". (*Shotwell's Estate*, 1 Pa. St. 257.) Courts, whenever called upon to express themselves on this subject, have not been sparing in the use of forceful language. In *Werstler* v. *Custer*, 46 Pa. 502, the court said: "The legal presumption is always in favor of sanity, especially after attestation by subscribing witnesses, for, as was said by Parsons, C. J., in *Buckminster* v. *Perry*, 4 Mass. 593,

594, it is the duty of the subscribing witnesses to be satisfied of the testator's sanity before they subscribe the instrument. No honest man will subscribe as a witness to a will, or any other instrument executed by an insane man, an imbecile, an idiot, or a person manifestly incompetent for any reason to perform, with legal effect, the act in question. A duty attaches to the witness to satisfy himself of the competency of the party before he lends his name to attest the act. Like a magistrate who takes an acknowledgment of a deed, he is to be reasonably assured of the facts he undertakes to verify, else he makes himself instrumental in a fraud upon the public.''

Our own court, in the *Estate of Motz*, 136 Cal. 558 [69 Pac. 294], made the observation which must be in the mind of every person who gives any thought to the subject. We said: ''When a witness has solemnly subscribed his name to a will as an attesting witness, knowing the nature of his act, and that deceased would rely upon his name as a part of the execution of the will, undertakes by his evidence to overthrow or cast suspicion upon it, his evidence should be closely scrutinized.''

Inasmuch as we are reversing the judgment, we deem it proper to give a brief summary of the testimony of each one of the witnesses upon whom respondent relies to sustain the judgment. Appellant rests her appeal squarely and solely upon the testimony offered by contestant, and none other is brought up.

It appears without contradiction that Lorenzo B. Wright, testator, met Mrs. Grace Thomas, a notary public and realtor with whom he had transacted business and whom he had known for many years, in the postoffice and asked her what her charge would be for drawing his will. He told her he was coming to her office to have her prepare his will. About three weeks thereafter he came alone to her office, bringing with him memoranda sheets upon which he had written the names of the persons whom he wished to enjoy his property and the specific shares thereof after his death. She prepared the will accordingly. She was not acquainted with any of the persons whose names appeared on the memoranda prepared by him. She testified that she believed at the time he executed the will that he was of unsound mind. Pressed for the grounds of her opinion she

said it was the "funniest will she had ever seen" in that it gave $1 to each of a number of different persons she did not know; that she had thought him *queer* for a long time; that he did not have in mind the legal description of the property but that she had it listed for sale and rent. The above contains the entire substance of her testimony.

James Thomas, a witness to the will, was next called by the contestant. It does not appear what relation he bears, if any, to Mrs. Grace Thomas, the scrivener, or who solicited him to become a witness. He stated that he "believed" the testator was not of sound mind; that in his opinion testator had not been of sound mind for some years prior to the execution of the will. He seemed unable to give a single reason supporting his opinion.

G. W. Madden, the other subscribing witness, when pressed for the reason of his opinion that the testator "was not of sound mind" at the time he signed the will, was also unable to say more than that he considered him of unsound mind for some time prior to the making of the will.

Mrs. Brem had known testator for sixteen years and said it was her belief that he was of unsound mind on the day the will was executed. Pressed for the reasons of her opinion (Code Civ. Proc. 1870, subd. 10), she said he had had a serious operation some years prior; he once told her he had lost $50,000 in some bank failure and she was sure from the way he lived alone in his little shack, with all the dirt and junk he had, that he was not right; he once gave her a fish (he spent much time in fishing) which he said he had caught and she found it had been soaked in kerosene and when he asked her how she liked it he laughed and said he had put the kerosene on it before he brought it to her; once he came to her house and insisted on buying her household furniture and when told it was not for sale and that she had not offered it for sale he insisted on buying it anyway. Mr. Brem testified substantially as his wife had testified, but added the statement that "Mr. Wright often chased the children out of his yard and turned the hose on them and that children in the neighborhood were afraid of Mr. Wright." He did not explain why they often returned to his yard if they feared him.

Mrs. Daisy Smith, a cousin not named in the will, testified that she believed him to be unsound in mind. Her reasons

were that he drank and was drunk much of the time since his wife died; that some years ago he suffered an injury to his head and several stitches were required to close the wound; that the injury seemed to change him; that he had a serious operation in 1921; on one or more occasions he ran out of the house only partly dressed and they had to follow him and had difficulty in getting him back to bed; that he picked up silverware and other articles from the garbage cans and hid these things around the house; that he picked up paper flowers from the garbage cans, and waste, and pinned them on rose bushes in his yard and took the witness to look at his roses; that he went away with a blanket wrapped around him and was gone several days and made no explanation as to where he went; that he took from his daughter's house a radio which the witness said he had given to his daughter and granddaughter without making any explanation as to why he did so; that she knew he had been quite sick a number of times and that he did not have much care or attention; that he suffered a great deal.

Marjorie Jean Angell, a granddaughter, placed her belief that testator was unsound of mind on the ground that he acted funny and queer; that he told a number of persons that he had sent Christmas presents and a turkey to them when he had not done so; she related the removal of the radio from her mother's home which they claimed he had given to them; at times he would pass her on the street without speaking and at other times he would speak and seem friendly; one time he told her she had on too much rouge and powder or paint, when she did not have any amount on; that her mother often invited him to their home for dinner. He would say he would come but he did not appear. He collected old articles from the rubbish and garbage wagon when he drove the garbage wagon and had them about the house and he had a lot of old stuff hidden in the house.

Cloyd Angell, the grandson, thought testator of unsound mind. His reasons were: He had seen him fishing on the wharf at Venice and he did not tell his friends and acquaintances on the pier that witness was his grandson; neither did the witness tell his friends that testator was his grandfather. He had often seen him drunk on the pier.

Some eight or ten years before his death his grandfather seemed fond of him and he used to ride with him on the garbage wagon, but his attitude changed in later years, for no reason of which he was aware, and he did not have much to do with him; he had a lot of junk and old empty liquor bottles hidden around the house.

Hariett E. McClelland said she had known testator for a number of years. She believed him to be of unsound mind. She testified that she had been closely associated with him and that she had often taken him riding in her automobile and he had stayed at her home on many occasions when ill and that when he ran away and his friends or relatives did not know where he was he was at her home; when at her home he drank a good deal; in 1929 and 1930.he was quite ill at her home; he told her about a number of houses that he had at Salt Lake City, his former home and where she had known testator, but she knew that he did not own them; he collected paper flowers from the garbage cans and pinned them on the bushes in his yard and laughingly said to her that he would fool the people as they would think the flowers were blooming; that one time he told the witness in the presence of her mother that she was his natural daughter. The mother became exceedingly angry at him and it does not appear that he ever repeated the statement. The witness related an ailment which the testator had while living at her house during which he would be prone, hold his breath and appear to be dead; that when she returned from her quest for help she would find him up and walking about; that he said he did this to scare his neighbors and make them think he was dead.

Minnie Connor, a half-sister of testator, was bequeathed one dollar. She testified that he was in a bad accident at Salt Lake City thirty years before and he had been queer since. In 1919 he had an operation and nine years before death he injured his hand and was sick at her home for some time and was delirious a part of the time and ran out of the house only half clothed; she related the radio incident, the injury to his head, and said that once while at her home on her invitation to dine he left before the meal and did not return. On another occasion he asked her which bus to take to go to the pier, although he was

accustomed to ride on a bus to the pier. The witness also testified that the testator's mother had been insane more than a year before her death. His mother was never adjudged insane but was recognized as being not right. She did not state his mother's age, nor is there the slightest evidence tending to show congenital insanity in the family.

Alma Angell, the son-in-law, against whom an unlawful detainer suit was successfully prosecuted by testator, he and his wife being ejected from the premises of testator, testified that testator and himself had been good friends, pals, up to ten years prior to his death, at which time testator's attitude very radically changed and he did not seem to like either him or his son Cloyd. His testimony followed closely the testimony of the witnesses already set out. In addition, he stated that after the Salt Lake City injury the decedent malingered by resorting to the use of a wheel chair "to frame up a showing to prove damages in a suit which was pending as a result of the accident". He was of the opinion that testator had not been right since the Venice accident which occurred some ten years before his demise.

Maud Wright Angell, daughter of testator and contestant herein, testified substantially to all the circumstances and matters recited by her husband. Her belief that testator was of unsound mind was premised on his changed attitude toward her and her family which she says took place some ten years prior to his death, occasioned by the injury to his head. She said that he drank a good deal. After he was taken to the hospital and just before he died he sent for her and he was "very usual and normal".

A certified copy of transcript of the docket of the Justice's Court of Venice Township, an action in unlawful detainer, brought by Lorenzo B. Wright against A. H. Angell, Maud Angell et al., in 1924, showed that judgment went for plaintiff for the possession of the residence property and for $50 damages and costs of suit. She testified that after her mother's death her father asked her to come and live in the house and she furnished all supplies and did the cooking and the housework. The judgment is conclusive on the question that defendants were unlawfully in possession. She further testified that the judgment was not enforced against her husband or herself and they moved

as soon as they found another house; that he said he would help them in finding a house; that they continued to be good friends; that she never had any trouble with her father but "considered" that he was not just right and she did not cross him; that she did not know Charlotte Josephine Hindmarch; that she would go to his house and clean up for him as often as he would allow her to do so.

Shirley Yvonne Stone, whose grandmother was a sister of decedent, testified that she had known the testator all her life; that she had seen him on a few occasions at her grandmother's home but had only seen him a few times during the last year of his life; that she did not think him to be of sound mind. Her reason for her belief was that she had seen a lot of bottles in his home and under his bed; that once when she was at his home he took what appeared to be soiled clothes from a closet and put them back about three times; that he took a picture of a lady and showed it to her grandmother; that once he complained of being ill and asked her grandmother if she knew the kind of medicine to take for his complaint and when told by her to go to the drug store he said he would not go; she recalled that once he was invited to her grandmother's house but he said he had another engagement and did not go; he never treated her unkindly or frightened her.

█ The foregoing sets forth the full strength of contestant's case. Tested by the decisions of this court the judgment is wholly without evidentiary support. There is no evidence that testator suffered from settled insanity, hallucinations or delusions. Testamentary capacity cannot be destroyed by showing a few isolated acts, foibles, idiosyncrasies, moral or mental irregularities or departures from the normal unless they directly bear upon and have influenced the testamentary act. █ No medical testimony as to the extent of any injury the testator had received or its effect upon him either physically or mentally was introduced in the case. The burden was upon contestant throughout the case. Taking all the evidence adduced by contestant as true, it falls far below the requirements of the law as constituting satisfactory rebuttal of the inference of testamentary capacity. No proof whatever was offered tending to rebut the testator's ability to transact or conduct his business or to care for himself except in a few cases of

illness brought about by natural causes or excesses or by accident. He went alone to the scrivener's with a list of beneficiaries prepared by himself, giving his daughter one piece of improved real property and Charlotte Josephine Hindmarch, whom he designated as his friend, the other. To his granddaughter he bequeathed his undivided interest in an estate known as the Brazier Estate, and he named seven others to whom he made nominal bequests. There is no evidence that he did not appreciate his relations and obligations to others, or that he was not mindful of the property which he possessed. The opinions or beliefs of those who testified that he was not of sound mind rest upon testimony of the most trivial character and do not establish testamentary incapacity at the time he executed his will.

It does not appear that his daughter or members of her family were concerned as to his comfort or well-being, as the testimony of some of the witnesses shows that he lived a portion of his time in a condition of squalor and that he was cared for when ill by others. The attention given to his comfort by Charlotte Josephine Hindmarch does not appear, as the appeal is based solely upon the evidence adduced by contestant in support of her claim that he lacked testamentary capacity.

A brief quotation from one of the many standard cases of this court will suffice to illustrate the insufficiency of the evidence in the instant case to support a finding that the testator was not competent to make disposition of his property. In *Estate of Perkins,* 193 Cal. 699 [235 Pac. 45], the rule to be applied in cases where testamentary incapacity is the issue, supported by a long line of cases, is stated as follows:

"Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) insanity of such broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion. Even in the latter class of cases, it is not sufficient merely to establish that a testator was the victim of some hallucination or delusion. The evidence must establish that the will itself was the creature or product of such hallucination or delusion; that the hallucination or

delusion bore directly upon and influenced the creation and terms of the testamentary instrument. The evidence must establish, in addition to the fact of the existence of the hallucinations or delusions, the fact that by reason of these hallucinations or delusions the testatrix devised or bequeathed her property in a way which, except for the existence of such delusions, she would not have done. In short, the abnormality of mind must have had a direct influence upon the testamentary act. (*Estate of Chavallier*, (159 Cal. 161 [113 Pac. 130]) *supra; Estate of Collins*, 174 Cal. 663, 670 [164 Pac. 1110]; *Estate of Redfield*, 116 Cal. 637 [48 Pac. 794]; *Estate of Cassarotti*, (184 Cal. 73 [192 Pac. 1085]) *supra.*)''

For the foregoing reasons the judgment and order are reversed.

Curtis, J., Waste, C. J., and Thompson, J., concurred.