[Civ. No. 10732. First Appellate District, Division Two.—May 18, 1938.]

AMERICAN TRUST COMPANY (a Corporation), Appellant, v. EDITH MAY DIXON et al., Respondents.

Edmund de Freitas, A. J. Woolsey, Cushing & Cushing and Delger Trowbridge for Appellant.

Dunn, White & Aiken and Carlos G. White, for Respondents.

SPENCE, J.—Plaintiff was named as trustee under a declaration of trust made by Margaret M. Higgins, now deceased, dated October 2, 1931, and an amendment thereto dated November 23, 1931. This action was originally brought by plaintiff to obtain declaratory relief. Defendant Edith May Dixon, the daughter of the deceased, and defendant Melvin E. Shreder, the adopted son of said daughter, filed an answer and cross-complaint seeking to set aside said instruments upon the ground of alleged unsoundness of mind and undue influence. It is stated in the briefs that no evidence was introduced on the complaint for declaratory relief as the matter involved therein had become a moot question prior to the trial. The cause proceeded to trial before the court sitting without a jury upon the cross-complaint and the answer thereto. The trial court granted the cross-defendant's motion for nonsuit on the issue of undue influence but found in favor of the cross-complainants upon the issue of unsoundness of mind. It filed its findings of fact and conclusions of law to the effect that the instruments

dated October 2, 1931, and November 23, 1931, were null and void because of the unsoundness of mind of said Margaret M. Higgins and that cross-complainants were entitled to an accounting. An interlocutory decree was entered declaring cross-defendant to be an involuntary trustee and directing cross-defendant to render an accounting of all the trust property and the proceeds thereof, which were to be thereafter transferred to cross-complainant Edith May Dixon. Thereafter a final decree was entered decreeing that said instruments were null and void and canceling the same. Said decree also contained further provision for the transfer of the trust property. Cross-defendant appeals from the interlocutory decree and from the final decree.

We are of the opinion that no appeal could be taken from said interlocutory decree. (Code Civ. Proc., sec. 963; *Middleton* v. *Finney,* 214 Cal. 523 [6 Pac. (2d) 938]; *Gunder* v. *Gunder,* 208 Cal. 559 [282 Pac. 794]; *McFarland* v. *Mott,* 123 Cal. App. 79 [11 Pac. (2d) 18].) Said interlocutory decree is reviewable, however, upon the appeal from said final decree. (Code Civ. Proc., sec. 956.)

The main contention of appellant herein is that there was no substantial evidence to support the trial court's findings to the effect that Margaret H. Higgins was of unsound mind at the time of the execution of said instruments. A review of the voluminous record and briefs leads us to the conclusion that this contention must be sustained, and it therefore appears unnecessary to discuss the other contentions of appellant.

Before summarizing the evidence, the provisions of the declaration of trust and the amendment thereto may be briefly outlined. By the declaration of trust dated October 2, 1931, the deceased transferred to appellant, as trustee, five parcels of real property, a group of stocks and bonds and a promissory note in the principal sum of $13,875, together with the mortgage securing the same. The trustee was given the usual powers conferred upon trustees with respect to the management, investment and reinvestment of the trust propery but reserving the right to the trustor to give written directions during her lifetime as to the exercise of these powers. It was further provided that the net income should be paid to the trustor during her lifetime, and that upon her death, said income should be paid 75 per cent

to respondent Edith May Dixon and 25 per cent to respondent Melvin E. Shreder. The trust was not to continue beyond the life of the survivor of the two respondents and, upon its termination, the trust estate was to vest in Florence G. Hays, the niece of the trustor, or the issue of said Florence G. Hays. The trust was made revocable and the power to amend was reserved. There was also a so-called spendthrift provision prohibiting the assignment by the beneficiaries of any interest in the trust. By the amendment dated November 23, 1931, the sole change made was to provide that the trustee should pay out of the trust estate the expenses of the last illness and of the funeral of the trustor.

It therefore appears that said declaration of trust provided for an entirely natural disposition of the trust estate and the proceeds thereof in favor of the natural objects of the bounty of the trustor. It may be stated that the deceased had directed the preparation of five wills during the years from 1927 to the time of the execution of the declaration of trust in 1931, three of which had been executed by her, and in each of said five wills said respondents and said niece were the persons named as beneficiaries. Each of said wills was slightly different from the others but all provided for the creation of trusts. Some contained emergency clauses empowering the trustee to supplement the payment of the income to respondents by payments from the *corpus* under certain circumstances. Respondents strongly stress the omission of an emergency clause from the declaration of trust in question, and said omission appears to be the main ground of complaint of respondents.

It may be further stated that the execution of the declaration of trust and the execution of the amendment thereto cannot be termed death-bed acts on the part of the deceased. These instruments were executed at the office of the trustee at a time when the deceased was actively caring for herself and her property and was apparently enjoying life as much as does the average person of her age. The deceased died on February 16, 1933, being about 16 months after the execution of the instruments in question.

When the declaration of trust was executed on October 2, 1931, Mrs. Higgins was 77 years of age and was residing at her home in Richmond. She had formerly lived for many years with her husband on a walnut grove in Covina. Mr.

Higgins had died in 1926 and Mrs. Higgins managed the walnut grove until she moved to Richmond in 1927. She opened a bank account with appellant in 1927 and had numerous business dealings with the bank from that time until her death. Until the time of executing the declaration of trust, she had carried on all of her own business affairs including dealing in real property, building a home, managing her own household and handling all those transactions which are normally incident to the life of a person in her position. In 1930 Dr. Denman treated her for an abscess of her hip. Again in 1931, he treated her for bronchitis and a threat of pleurisy. Dr. Lacey also treated her in August, 1931, when she was suffering from hypertension. She also suffered from a high fever during that month. She nevertheless recovered from these illnesses.

In September, 1931, Mrs. Higgins first discussed with an officer of appellant her desire to execute a living trust as distinguished from a trust created by will. Several conversations were had on this subject at various times before the declaration of trust was executed. She indicated that she desired to eliminate the cost of probating a will and also indicated that she wanted to keep the principal of her holdings intact in order that her daughter might have some income, although small, for the entire life of the daughter. Mrs. Higgins' property had declined in value and, as she felt that her daughter was improvident and would not act wisely if allowed to draw upon the *corpus* of the trust, she requested appellant to omit any provision which would permit this. The declaration of trust was drawn and executed as a result of these discussions. After the execution of the trust, it occurred to Mrs. Higgins that she had not provided for the payment of the expenses of her last illness and her funeral expenses out of the trust property. On her own initiative, she again consulted an officer of appellant and arranged for and executed the amendment of November 23, 1931.

Thereafter Mrs. Higgins consulted various officers of appellant at the bank on several occasions, and gave instructions as to the management of the trust properties as she had the right to do under the declaration of trust. She also withdrew properties from and added properties to the trust estate. She also carried on litigation, as plaintiff, for the foreclosure

of the mortgage on the Covina walnut grove. In fact, the record discloses that she was quite active for a woman of her age and that she engaged in both social and business activities. She visited friends at various times, including times both shortly before and shortly after the execution of the declaration of trust and the amendment, and she had guests at her own home for dinner on various occasions including Christmas Day, December 25, 1931.

There were introduced in evidence numerous letters and other documents written and executed by Mrs. Higgins. Nine of these bore various dates in 1931 and seventeen bore various dates in 1932. An examination of the substance, form and penmanship of these letters and documents can lead only to the conclusion that Mrs. Higgins was entirely normal at the times said letters were written, and that she was apparently quite a remarkable woman for her age. With the facts before him including these letters and documents, Dr. Rowell expressed the opinion as follows: ''I think that there is enough to show that at any and all times she knew what she was doing, and was a rather clever, shrewd business woman.''

On December 29, 1932, Mrs. Higgins was attended by Dr. Fraser, who attended her through her last illness and until her death on February 16, 1933. In the light of the testimony given by Dr. Fraser on the trial, it is interesting to note that his records showed a memorandum made by him on December 29, 1932, with respect to Mrs. Higgins' condition. In this memorandum he noted her as ''mentally active''. It may be further stated that Dr. Fraser testified that he was present when Mrs. Higgins executed a will on February 4, 1933, being 12 days before her death, and that in his opinion she was competent to execute a will at that time. After the death of Mrs. Higgins, respondents recognized the trust and accepted benefits therefrom until after the filing of this action for declaratory relief and at all times prior to the filing of their cross-complaint on December 16, 1933.

█ We now turn to the testimony introduced by respondents in support of their claim that Mrs. Higgins was of unsound mind on October 2, 1931, and on November 23, 1931, bearing in mind that there is a presumption that Mrs. Higgins was at all times of sound mind and that the burden was upon respondents to show affirmatively by a prepon-

derance of the evidence that Mrs. Higgins was of unsound mind at the times in question. (*Estate of Sexton,* 199 Cal. 759 [251 Pac. 778]; *Estate of Perkins,* 195 Cal. 699 [235 Pac. 45]; *Estate of Casarotti,* 184 Cal. 73 [192 Pac. 1085].)

Said testimony consisted mainly of the opinions of two medical men, Dr. Fraser and Dr. Merrithew, based upon hypothetical questions, and the opinions of certain acquaintances of Mrs. Higgins, based upon observation, as to the competency of Mrs. Higgins. The field covered by the direct and cross examination of these witnesses was very broad and it would be difficult to relate all of the testimony which was admitted as constituting alleged reasons for the opinions of these witnesses. ■ It is well settled, of course, that while both expert and nonexpert witnesses may express opinions on the issue of competency, it is not the abstract opinions which are of importance but the reasons given in support of such opinions. (*Estate of Wright,* 7 Cal. (2d) 348 [60 Pac. (2d) 434]; *Estate of Finkler,* 3 Cal. (2d) 584 [46 Pac. (2d) 149]; *Estate of Smethurst,* 15 Cal. App. (2d) 322 [59 Pac. (2d) 830].)

In support of their opinions and as reasons therefor, respondents' witnesses gave testimony concerning the physical impairment of Mrs. Higgins including arteriosclerosis and high blood pressure and other ailments common to old age; also testimony concerning claimed mental impairment evidenced by lack of memory at times, inability to concentrate at times, the doing of eccentric things at times and the laboring under alleged delusions at times. There was also evidence of nervousness, irritability, stubbornness and similar characteristics and traits. Some of this testimony referred to the time shortly after the death of Mr. Higgins when Mrs. Higgins was suffering from the shock of the loss of her husband and other testimony referred to the time in August, 1931, when Mrs. Higgins was ill and was suffering from a high fever. In any event, none of this testimony was based upon the actions of Mrs. Higgins at or about the time of executing the instruments in question and it does not appear that any of the respondents' witnesses had seen Mrs. Higgins either upon October 2, 1931, or upon November 23, 1931.

We will now consider the testimony of certain witnesses, upon whose testimony respondents place their greatest reliance, in order to show how unsubstantial their testimony was

when viewed in the light of the authorities dealing with the subject of what constitutes substantial testimony on the issue of incompetency.

Dr. Fraser testified that he first saw Mrs. Higgins on December 29, 1932. Attempts were made to obtain answers to hypothetical questions on his direct examination but the questions and answers on direct examination fail to show any clear statement as to just what the witness' opinion was concerning the competency of Mrs. Higgins on October 2, 1931, and November 23, 1931. Furthermore, none of these questions disclosed to the witness the letters and other documents of Mrs. Higgins, the importance of which omission is emphasized in *Estate of Clark,* 100 Cal. App. 357 [280 Pac. 204]. The thought of the witness on the subject of competency is probably well summed up in his statement that "I do not think anyone with a delusion is competent". This may be true from a medical standpoint but it is certainly not true from a legal standpoint. (*Estate of Finkler, supra.*) The witness' answers given on cross-examination appear for the most part to be far more favorable to appellant's claims than to those of respondents. We will quote some of his testimony on cross-examination which is fairly indicative of the tenor of his entire testimony.

The witness testified, "It is quite characteristic, your Honor, of this particular type of mental disturbance to have perfectly lucid intervals all through the duration of this psychosis up until the time when they have acute symptoms, such as preuremic stage, in the last stage, say, of a kidney failure or, of course, in a comatose stage, of a cerebral hemorrhage, but all through the illness they are perfectly lucid at intervals." When asked whether the reading of Mrs. Higgins' letters would influence him in his opinion as to her condition at the time she signed the instrument in question, he said, "Not unless I knew the medical or the physical condition on that day that the document was executed. In other words, as I mentioned this morning, she may have instances or intervals of perfectly lucid mentality. Now whether or not she would have enough—whether she has such intervals of such a mentality on the date that this instrument was executed, I don't know."

With respect to the letters of Mrs. Higgins and along the line of the foregoing testimony, the following questions and

answers of Dr. Fraser are found in the record: "Q. Weren't you able to ascertain from the reading of the letters, the fact that on the date of the letters—the respective letters, Mrs. Higgins had the mentality to carry in mind the nature and value of her property? A. I believe so on those dates, yes. Q. Were you able to ascertain that she would be able to carry in mind the relationship of her relatives to her and those that were dear and near to her? A. On the dates of the letters, yes. Q. Yes? A. I believe so. Q. Were you able to ascertain that she might be able to dispose of property mentioned in those letters on the 2nd day of October, 1931? A. I couldn't tell whether she was on the particular day mentioned but I would say that on those dates that the letters were written that she was. Q. Well, having conceded that, suppose on the 2nd day of October, 1931, and on the 23rd day of November, 1931, the two dates on which the documents were executed, Mrs. Higgins had what you term lucid intervals, would she during any one of those intervals be able to execute such a document? A. I think so if her medical condition was such that—or appeared to be as good as those letters—as she was on the dates that these letters were written. Q. Yes, well, wouldn't you say that on the respective days that she wrote those letters and at the very instant or hour or half hour that she expended in writing those letters, that she was all right mentally? A. I think so, yes. Q. Yes? A. But she might be suffering from high blood pressure or an arterial-sclerotic condition. Q. Yes, but wouldn't the contents of those letters, Doctor, indicate to you, as a medical expert—you are here as an expert, Doctor, on the very instant that she wrote those letters—started to write them, during all the time that she was writing them, that her blood pressure and her sclerotic condition did not affect her mental condition? A. Yes, I agree with that."

The only other expert witness called by respondents was Dr. Merrithew and his testimony was of no greater assistance to respondents than that of Dr. Fraser. When asked if he had been sufficiently informed to pass on the competency of Mrs. Higgins, he stated, "Of course, it is a pretty hard thing, as you can realize. I never met this lady." He did give his opinion that Mrs. Higgins was not competent but this opinion was followed by the following questions and answers: "The Court: Even though she could understand

the nature and location of her property and the nature of the act she was doing? A. I think she did and I have testified to that all the way through. Q. Yes, but, Doctor, you have testified that in your opinion she did know the nature of her act when she had that amendment prepared. Wouldn't that influence you to the effect that she knew the nature of the original act, that is, the main instrument? A. I think she did. Q. The trust agreement itself? A. I think she did. I think she knew—I think she had that thing drawn up just the way she wanted it. Q. Yes. A. Still I don't think she was competent from the history you relate to me. Q. Still you feel that she had both instruments drawn up the way she wanted them? A. I do." "Q. You notice that there was provision made for them? A. If I remember right, one was to have three-fourths and the other one-fourth of her income. Q. Do you think she did understand her relations to the persons who had claim to her bounty? A. I think she did. Q. Yes. Going back to Number 2. You noticed, did you not, Doctor, that there was mention of her property in the trust agreement? A. It was stock and property. Q. Of October 2, 1931. A. Stocks and properties and amounts, yes, sir. Q. Yes. Then did you say in response to Number 2 that she understood and recollected the nature of her property? A. I think possibly she did. I think she knew everything she had. Q. Yes. Then would you say in response to Number 1 that she had the ability to understand the nature of the act she was doing? A. I think she understood, as I said before. Q. Yes, and your answers would be the same for the document that she signed on November 23, 1931? A. Yes, sir."

It should be remembered that it was over a year after the execution of the instruments that Dr. Fraser first saw Mrs. Higgins. Dr. Merrithew never saw her at all. The hypothetical questions assembled the testimony upon which respondents relied to show deviations from the normal at times and in answer to the hypothetical questions or other questions, the doctors expressed in some form the opinion that Mrs. Higgins was not competent. However, the testimony assembled in the hypothetical questions was only remotely connected in point of time with the execution of the instruments and there was no testimony stated in the hypothetical questions relating

to claimed deviations from normal which occurred closer to the times in question than August, 1931.

The testimony of the nonexpert witnesses produced by respondents was likewise unsubstantial. It would serve no useful purpose to relate the testimony of each of said witnesses. Their opinions were all based upon the matters hereinabove referred to. None of the witnesses appeared to believe that Mrs. Higgins was incompetent at all times but, as some expressed it, they believed she had good times and bad times or good cycles and bad cycles. None of the witnesses saw her on the days in question and none could testify as to whether she was having a so-called bad time or bad cycle when the instruments were executed. The reasons given by most of the witnesses were wholly insufficient to show that Mrs. Higgins was incompetent at any time and it is probable that the main reason for their opinions is found in the conclusion drawn and expressed by respondent Edith May Dixon as a reason for her opinion. She concluded that owing to her own needs and the diminished value and income of the trust estate, her mother "would never have signed the October 2, 1931, declaration of trust if she had been in her right mind and understood it". This reason is strongly stressed by respondents in their brief and is dignified by the caption "Res Ipsa Loquitur". But we are of the opinion that this conclusion and the other alleged reasons stated by the witnesses were wholly insufficient to sustain their opinions as to the general mental incompetency of Mrs. Higgins, and that the record is devoid of any substantial evidence to sustain the findings of general mental incompetency. There are numerous authorities on the subject of what constitutes substantial evidence of general mental incompetency and in many of the cases a stronger showing than that made in the present case was held to be insufficient. (*Estate of Wright, supra; Estate of Finkler, supra; Estate of Presho,* 196 Cal. 639 [238 Pac. 944]; *Estate of Perkins, supra; Estate of MacCrellish,* 167 Cal. 711 [141 Pac. 257, L. R. A. 1915A, 443]; *Estate of Grant,* 8 Cal. App. (2d) 232 [47 Pac. (2d) 508]; *Estate of Short,* 7 Cal. App. (2d) 512 [47 Pac. (2d) 555]; *Estate of McDonnell,* 109 Cal. App. 577 [293 Pac. 651]; *Estate of Whitworth,* 110 Cal. App. 526 [294 Pac. 84]; *Estate of Clark, supra; Rollins* v. *Smith,* 72 Cal. App. 773 [238 Pac. 171]; *Estate of Little,* 46 Cal. App. 776 [189 Pac. 818].)

■ Respondents apparently contend that regardless of the question of the sufficiency of the evidence to show general mental incompetency, there was sufficient evidence to show that Mrs. Higgins suffered from delusions "which created unjust antagonism and distrust toward her daughter". This contention would seem to be at variance with the portion of respondents' brief which dwells at length on the love and affection which existed between the mother and daughter throughout their lives and down to the very time of the death of Mrs. Higgins. It is apparent that it is not contended that Mrs. Higgins entertained any fixed delusions producing such antagonism and distrust but evidence was introduced which showed that at certain times, particularly after the death of Mr. Higgins in 1926 and again in August, 1931, Mrs. Higgins did certain things from which it might be inferred that she did suffer from certain delusions at said times. But there is not a particle of evidence from which it could be inferred that Mrs. Higgins was suffering from any delusion of any kind on October 2, 1931, or November 23, 1931. On the contrary, it affirmatively appears that Mrs. Higgins was not suffering from any delusion at either of said times, and that she was motivated by feelings of affection for respondents in providing in the declaration of trust that they should receive the entire income of the trust estate. It appears, however, that Mrs. Higgins believed that respondents were improvident and that the provisions of the declaration of trust constituted the best means of making certain that respondents would have some income from the trust estate throughout their lives and that respondents could not dissipate the trust estate. Such a belief was not a delusion and we need only turn to the testimony of Dr. Merrithew on this subject. He was asked, "Well, Doctor, assume that she felt that her daughter was improvident in the use of money, didn't know how to take care of money and that she knew how much she had and wanted that money fixed so that her daughter would have a life income and that she had stated that she didn't want her daughter to squander it, would that influence you?" He answered, "Well, if those are the facts, it wouldn't be a delusion." It appears that this belief was a rational belief on the part of Mrs. Higgins but it would be immaterial if it was a mistaken belief. (*Estate of Powell*, 113 Cal. App. 670 [299 Pac. 108]; *Estate of*

*Peterson,* 13 Cal. App. (2d) 709 [57 Pac. (2d) 584].) We conclude that the evidence was insufficient to show that Mrs. Higgins was suffering from any delusion at the times in question or that any delusion "bore directly upon and influenced the creation and terms of" the trust. (*Estate of Finkler, supra; Estate of Clark, supra.*)

Respondents contend that there were other findings sufficient to sustain the interlocutory and final decrees but a review of the findings shows that said decrees cannot stand unless the findings relating to the incompetency of the testator may be sustained. As above indicated, we are of the opinion that there was no substantial evidence to support said findings.

This cause has been fully tried as is evidenced by the voluminous transcript. The evidence produced by both sides indicates that no useful purpose would be served by a second trial and it therefore appears appropriate to order a reversal with directions.

The interlocutory decree and final decree are reversed with directions to the trial court to enter a decree denying the relief prayed for in the cross-complaint.

Nourse, P. J., and Sturtevant, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 18, 1938, and the original judgment, dated April 18, 1938, was modified to read as above; and a petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 15, 1938.