[Civ. No. 12252. First Dist., Div. Two. Nov. 18, 1942.]

Estate of CHARLES W. BUTHMANN, Deceased. MARY CHRISTIN et al., Appellants, v. EUGENE BRODER-ICK, as Executor, etc., et al., Respondents.

George K. Ford and Simpson Finnell, Jr., for Appellants.

Ervin S. Best for Respondents.

SPENCE, J.—This is an appeal by contestants from a judgment of nonsuit entered at the conclusion of contestants' case in a contest after probate of the will of the deceased. The question presented is whether the trial court erred in granting the nonsuit. The contestants' case was based solely upon the theory that the deceased lacked testamentary capacity.

Charles W. Buthmann, deceased, was 63 years of age at the time of his death in August, 1939. He had married Caroline Buthmann in 1924. She became ill in 1932 and she died in 1935. In the latter part of 1936, the deceased made a trip east to visit his brothers, his sisters and other relatives. After his return, he executed his will on June 4, 1937, and thereby disposed of a substantial estate. In his will he made a few charitable bequests and left the residue of his estate to be divided as follows: Three-fourths thereof to be divided equally between his six brothers and sisters and the remaining one-fourth thereof to be divided equally between six nieces and nephews. The contestant Mary Christin was the sister of Caroline Buthmann, deceased. The contestants Jack Buthmann, Frank Buthmann and Bernardine Kelly were the nephews and a niece of the deceased, none of whom had ever known or seen the deceased.

Deceased was actively engaged in business until January, 1939. Up to that time he had been engaged for many years as a "floor manager" or "customer's man" by a large stock brokerage concern in San Francisco. After that time the deceased failed rapidly. He was adjudged incompetent in April, 1939, and he died in August, 1939.

The contestants offered and the trial court admitted in evidence the medical testimony given in April, 1939, in the guardianship proceeding. The testimony was very brief. One doctor testified, "Mr. Buthmann is 63 years old. For several years he has been in the stock brokerage business. He was well up until January, when he went to the hospital, Franklin Hospital, for 5 weeks, and was treated there for a cold, angina pectoris and hypertension. During this time he showed some transitory confusion, and had occasional hallucinations. He was discharged around February 20 in an improved condition. Since that time up to the time he went

to the Stanford Hospital on March 30, his friends noticed that he showed some mental peculiarities, and he had a poor memory, and for the past week he shows disorientation, he has visual hallucinations, he is disoriented as to time—he imagines he has been in a hospital for a year—and he has cerebral arteriosclerosis and some hypertension of the—myocarditis is also present—and he is mentally incompetent.'' A second doctor merely concurred in these findings. It will be noted that this testimony was directed to the condition of the deceased in April, 1939, which was almost two years after the execution of the will of the deceased on June 4, 1937; and that the doctors testified that the deceased was well up until January, 1939.

The only other testimony introduced on the contest of the will, purporting to relate to the testamentary capacity of the deceased, was that of contestant Mary Christin, of Joan Christin and of Dr. Joseph Catton. None of these witnesses saw the deceased on or about June 4, 1937, the date of the execution of the will.

Mary Christin testified that she first met the deceased about a year before his marriage to her sister in 1924, but that she had seen the deceased only on five occasions after the death of her sister in 1935. These occasions were (1) Easter of 1936; (2) September of 1936; (3) Easter of 1937; (4) Easter of 1938; and (5) Christmas of 1938. She did not see him at any time during his illness in 1939. She testified that he was actively engaged in the stock brokerage business during the entire time she knew him, working daily except for Sundays, holidays and vacation periods.

It is very difficult to comprehend the testimony of this witness. She testified, ''. . . in my opinion, he wasn't of unsound mind at any time I ever saw him'' and ''I never would say Charlie was insane. I would never say that. . . . He wasn't out of his mind enough that I would call him insane or incompetent. I would never call him insane—never.'' On the other hand, she testified that the deceased was nervous and excitable at times, and for that reason she believed he was not ''of sound mind according to my idea.''

As to the years prior to the death of the wife of the deceased in 1935, she testified that, ''During the time his wife was alive he was of sound mind, if he wasn't he couldn't have held his job; he was always just the same during her lifetime, except that he was terribly nervous and excited

during her sickness; but I wouldn't say he was crazy, no";
that when his wife had her operation in 1932, "he was ter-
ribly upset—He seemed to be unable to stay around in her
presence when she was so ill, he thought so much of her and
because he was so upset and excited he couldn't stand to see
her so ill. He wasn't of sound mind according to my idea.
That is what I base my claim that he was incompetent and
unsound of mind on."

As to the visit at Easter of 1936, she testified, "I found
him to be normal in every way . . . he talked of market con-
ditions, also about our affairs; during these conversations
he was excitable at times. . . . He expressed grief over the
loss of his wife. He just seemed to be more or less out of his
mind on that one thing, on losing her; he would talk about
her and what he would say, however, would be true, because
he never said anything except the truth about her. . . . He
was very much grief-stricken and depressed with the loss of
his wife, but in my opinion he didn't have a sound mind for
this reason, that he grieved so over his wife, over losing her;
. . . He was out of his mind in this way—about losing his
wife—but, of course, he wasn't what you might say really
out of his mind completely, —No, he was just grief-stricken,
because he loved her—that was natural. . . . I never saw him
so bad that he didn't know exactly what he was doing; in
my opinion, he wasn't of unsound mind at any time I ever
saw him; I don't want to make the man out as crazy, although
in a way it was insane the way he showed his grief because
he would take it so hard; . . . I don't want to say that he
was of real unsound mind, he always had his mind in his con-
versations."

As to the visit in September, 1936, she testified, ". . . in
my opinion, he was of sound mind at that time. . . . He
then told me he was going to change his will and that he was
going back east for the purpose of meeting all of his rela-
tives again and to know them better, as he had not seen them
for many years and for the purpose of making his new will
after he had met them all again."

As to the visit at Easter of 1937, she testified that "once
he got terribly excited about a tragedy mentioned in the
newspaper—it was about a young girl who had been brutally
murdered and it seemed to upset him. It was that terrible
case where they found her body in Golden Gate Park and,
of course, he sympathized with the girl, however, there was

nothing about his sympathy that showed him to be insane or incompetent; yet I believe his sympathy for the murdered girl evidenced unsoundness of mind. He criticized the man who committed the murder and I think his criticism was right. . . . I never would say Charlie was insane. I would never say that. He was always calm, he was a man who had a routine and he carried it out to a 'T'; and he never seemed to get a great deal excited. He wasn't out of his mind completely. He wasn't out of his mind enough that I could call him insane or incompetent. I would never call him insane—never.''

As to the visit at Easter of 1938, she testified, ''He was normal as far as I noticed at that time, yes. That morning and I saw nothing that indicated that he was of unsound mind that afternoon or evening.''

As to the visit at Christmas of 1938, she testified, ''At that time he told me for the first time that he had made a new will. . . . he was rational and normal at that time; he was perfectly normal. He seemed to me to be better than ever before. . . . At that time, he was normal, sane and competent.''

Joan Christin had lived with contestant Mary Christin since Joan was five years of age but she had not been adopted. She was under the impression that the deceased was manager of the stock brokerage concern and that he worked constantly. She thought the deceased ''physically and mentally declined from 1932 on because he was excitable and irritable.'' She testified, ''In my opinion from 1932 on he was of unsound mind because he was very nervous and irritable.'' She saw the deceased on only three occasions after 1935 as follows: (1) September of 1936, (2) Easter of 1937, and (3) Christmas of 1938.

As to the visit of September, 1936, she testified that she and deceased discussed stocks and particularly those of aircraft companies and that they visited several aircraft factories and spent some time in them. He became excited when ''he talked of his dead wife, telling how much he missed her. . . . His excitability when talking of her led me to believe he was not normal.''

On the visit at Easter of 1937, they again talked of stocks and of his wife. She testified, ''He was still grieved a great deal for his wife. That was not normal.'' He told the wit-

ness he was going to remember her in his will. She testified that she believed him and believed he was of sound mind at that time. She gave no specific testimony regarding the visit at Christmas of 1938 but testified generally, "Most of the time he was irritable, nervous and excitable but there were times when he would be all right. I would say he was of unsound mind on some occasions and of sound mind on other occasions during the time of 1932 up to the period of 1938 when I last saw him."

The foregoing constitutes a fair summary of all the evidence offered by contestants regarding the mental condition of the deceased through witnesses who had known him. The only other evidence offered by contestants concerning the mental condition of the deceased was that of Dr. Catton, who had not known the deceased.

Dr. Catton's testimony was given in response to hypothetical questions based upon those portions of the foregoing testimony which appeared to contestants to be most favorable to them and omitting all portions which appeared to contestants to be unfavorable to them. By the main question the doctor was asked to assume, among other things, "that the examinations of April 18, 1939, showed the man to have cerebral arteriosclerois, some hypertension, myocarditis and mental incompetency" and that the truth of the findings on those examinations was affirmed by the judgment of the court finding that the man "was, on that date, mentally incompetent." The doctor was then asked his opinion as to the mental state of the man on April 18, 1939, the date on which he was adjudged incompetent. The doctor answered, "Of unsound mind." The doctor was thereafter asked if his answer would be any different with respect to his condition on June 4, 1937, the date on which the will was executed. He gave no direct answer and the substance of his answer is summed up in his statement as follows: "It seems that somewhere between the amount of symptoms, nervous and mental, that you related in 1932 and the very complete picture of April 18, 1939, it gives me my opinion as to how he was at the period two years before, but beyond that I cannot say whether he was a little worse than I think he was or, a little better than I think he was, it was the physical basis for mental disturbance, and it seems in view of your whole question, that there were certain signs of nervous and mental incapacity

present at that time." On cross-examination, the doctor testified, "I would not say that a man who showed nervousness was insane, otherwise I would be locked up sometimes; neither would I say a man showing irritability or excitability was insane; nor for any of those reasons would I say a man was incompetent. . . . But many men with arteriosclerosis have little or no mental defects. . . . I would say that a man who, for a period of thirty years, having retained the same position as a stock salesman or customer's man in a brokerage house and who was a telegraph operator in his earlier years and who worked constantly during all those years, up to seven months of his death, would not be suffering from cerebral arteriosclerosis sufficient to make him of unsound mind, such a man would be functioning fairly well and if he had arteriosclerosis, that particular man is not having his ability to carry on interfered with by the arteriosclerosis. To sum up what I have said, I would know the picture of a man, at the time he is making a will, to be able, more or less, to determine whether or not he was sound of mind at that time. . . ."

After the above recital of all the pertinent evidence offered by contestants on the subject of the mental condition of the deceased, it requires no lengthy discussion to support our conclusion that there was no substantial evidence from which the jury might have found that the deceased lacked testamentary capacity on June 4, 1937. The picture portrayed by contestants' evidence was that of an active business man who, prior to 1939, suffered no physical or mental impairment which affected to any appreciable degree his ability to carry on his work or to deal with his property. ■ The testimony concerning the nervousness and excitability of the deceased at times, which was the sole reason given by the witnesses who had known the deceased as the basis for the opinions upon which contestants rely, was wholly insufficient to support such opinions (*American Trust Co.* v. *Dixon,* 26 Cal. App.2d 426 [78 P.2d 449] and authorities cited therein on page 436), and it is well settled that while non-expert as well as expert witnesses may give their opinions on the issue of competency, it is not the mere opinions which are of importance but the reasons given in support of such opinions. (*Estate of Wright,* 7 Cal.2d 348 [60 P.2d 434]; *Estate of Finkler,* 3 Cal.2d 584 [46 P.2d 149]; *American Trust Co.* v. *Dixon,* 26 Cal.App.2d 426 [78 P.2d 449]; *Estate of Smethurst,* 15

Cal.App.2d 322 [59 P.2d 830].) As to the testimony of Dr. Catton, we find nothing which strengthened contestants' case. The most that he would say with respect to the condition of the deceased on June 4, 1937, in response to a question which omitted many of the facts shown by contestants' evidence, was that "it seems . . . that there were certain signs of nervous and mental incapacity at that time"; but any possible effect of this indefinite and unsatisfactory declaration was completely nullified by the doctor's testimony given on cross-examination when all of the facts shown by contestants' evidence were put before him. We therefore conclude that the testimony introduced by contestants was insufficient and that the trial court properly granted the motion for nonsuit.

The judgment is affirmed.

Sturtevant, J., and Dooling J. pro tem., concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 14, 1943. Carter, J., voted for a hearing.