In the Matter of the Estate of MARY REILLY, Deceased.

Surrogate's Court, Westchester County, April 7, 1931.

*Story & Krogmann* [*Paul L. Bleakley* of counsel], for the proponent.

*Cornelius J. Wood,* for the contestant.

SLATER, S. Mary Reilly lived at 30 Hall avenue, White Plains, and died on the 6th day of September, 1930. On September

17, 1930, a brother filed an application for letters of administration. On September twenty-fourth, Anna Wagner filed decedent's will, dated April 1, 1929, with a petition asking for probate.

Mary Reilly was a maiden woman of sixty years and upwards. She left two brothers, Mark R. and Christopher Reilly. Her estate, at the date of the paper writing, was about $8,000, the home valued at $5,000, and $3,000 in the bank.

The contestants are the brothers, Mark R. and Christy Reilly.

Mary Reilly with her five brothers came to White Plains about thirty years ago. The little house on Hall avenue was purchased by a brother John, who remained unmarried, and, upon his death, willed the property to Mary. The brother Val had died. Mark, another brother, lived in Brooklyn, and was the father of Anna Wagner and other children. The remaining brother, Chris, had never married and lived with his sister, Mary Reilly, at the Hall avenue house. Chris worked " on the corporation," meaning the city of White Plains, and Mary kept the house. In the fall of 1928 Mary Reilly suffered from a leg ulcer, and was treated by Dr. Cornelius Denehy of White Plains. Later, Anna Wagner, who is not an heir at law (her father, Mark, decedent's brother, being alive), came to White Plains from her home in Brooklyn to take care of the aunt. On March 9, 1929, Mary Reilly suffered a cerebral hemorrhage and was paralyzed on the right side, being confined to her bed for some months. For a period of ten days she was helpless and in a coma. After a time she began to improve from the effects of the stroke.

The attorney who drafted the will practiced law in Brooklyn and was unknown to Mary Reilly. He testified that he appeared upon the scene a few days prior to April 1, 1929, the date of the will, at the request of John Wagner and his wife, Anna Wagner, the legatee. The will appointed Anna Wagner executrix, required no bond, and gave all the property to her. It also contained the following paragraph:

" *Fourth*. I do hereby request Anna Wagner, sole beneficiary and executrix under this my Last Will and Testament, to care for my beloved brother, Christopher Riley, during the remainder of his life and, for that purpose desire that said Anna Wagner shall use such portion of my estate as she shall, in her discretion, deem necessary and proper, to effect the comfort and happiness of my said brother."

The clause is precatory. The attorney admits this. He testified that Mary Reilly told him she wanted to have her brother Christopher taken care of as long as he lived; that he explained to her that the clause as written was not " legally binding," " unen-

forceable," "meaningless." In other words, that Chris Reilly would have no legal rights that he could enforce in any court; that she understood it and that was the way she wanted it. Chris Reilly was not seen by the attorney; he was in a Brooklyn hospital at the time. He further testified that he knew who lived in the family, the members being Mary and Chris, the brother. He said she was sick in bed, but did not impress him as being very sick, the chief complaint seemed to be her leg. He further said he did not know she was paralyzed. He testified that he took notes from Mary Reilly and that Anna Wagner " came in several times and asked her aunt how she was," and otherwise indicated that Mary Reilly was in such mental condition as to be able to make a will. The notes for the paper writing were not produced. He further testified that Mary was able to converse with him and understood what was said, and could use her right side and hand. He said decedent had no difficulty in speech of any kind; that the home was a small three-room house, kitchen, sitting room and bedroom, all the rooms opening into each other; that the doors were open and Anna Wagner came in and out of the room during the progress of taking notes for the will-making. The attorney further testified that her hand was not guided and, when she signed, she wrote her signature freely. The other two witnesses to the will appeared at Anna or John Wagner's request, testified that the decedent was rational, and that the attorney asked her if it was her will and her reply was " Yes."

The witnesses for the contestant relate a different story as to Mary Reilly's physical and mental condition at this time. The doctor testified that she had suffered a cerebral hemorrhage on March 9, 1929, and remained unconscious for ten days; that she continued for some weeks, long after the period of the will-making, to be paralyzed, unable to move her lower extremities or her right arm; that she mumbled; that her sight was poor and her hearing congested. Upon the facts related, he gave as his opinion that on April 1, 1929, when the will was signed, Mary Reilly was irrational. The doctor made frequent visits to her. He further said that her replies were muffled and could not be understood. It was his opinion that on April first and a period about that time she was unable to write her name. He was asked if he thought she was competent and able to understand the legal effect of the clause which gave direction for the use of the property for the brother Chris' benefit. His reply was, " I certainly do not." He testified that, on April fourth, the decedent was still paralyzed in the lower extremities, " the right arm could move, but right hand, that is flex or extension of the fingers, could not; " that she could not talk

coherently; that on April fourth decedent was still irrational; that there was only a partial recovery many months later.

Mary Boyle, a nurse from the White Plains Nursing Association, attended upon the decedent throughout the months of March and April. She testified that decedent could not move her right leg and arm and did not reply to questions; that decedent's acts were irrational.

Louise Ballott, registered nurse, testified that she also attended the decedent on April first, and days thereafter. She asked decedent her name and age, and " she gave me her name ' Reilly,' and said she was twenty-seven years old." She said the decedent mumbled. The nurse was there on the morning of the day that the paper writing was executed; said that decedent was confined to her bed from the time of the stroke and that her condition from April first to May first remained about the same. She testified that, in her opinion, on April first Mary Reilly was irrational.

Mary Newman, a sister of Anna Wagner, testified that she was at the home on Sunday, March 31, 1929, and " she [decedent] did not know anyone." Helen Schildt, a daughter of Mary Newman, testified that she saw decedent the latter part of March, 1929, and that " she [decedent] bobbed her head and spoke in a mumble." Mary Newman's other daughter, Gertrude Reilly, testified that she, too, was there with the sister and said decedent just shook her head.

Margaret Ann Campbell, a neighbor, testified that in September, 1928, she was present in the home with the brothers, Mark Reilly and Chris Reilly, Anna Wagner and the decedent, and the decedent said " she wanted Chris taken care of by Anna Wagner." Q. " Did Anna Wagner promise to do that? " A. " She did." That Anna Wagner said she would take care of Christy Reilly provided decedent gave Anna the house, lot and $7,000 in the bank. " She [decedent] wanted Anna Wagner to have the house and take care of Christy for life." " She was afraid Christy would be put in a home." The witness was asked the following question: Q. " Did she speak about a will? " A. " Yes, she did. She said she would make a will and see that was in it."

The attorney retained the original paper writing. It next appeared when it was filed in this court. The attorney testified he left a copy with Mary Reilly, but such copy has not appeared in the case. Only the participants ever knew about the will-making.

Anna Wagner, the legatee, died in Brooklyn, intestate, on October 31, 1930, leaving a husband and infant children.

On September 25, 1929, November 26, 1929, and January 29, 1930, sums of money aggregating $1,900 were withdrawn from

decedent's savings bank account by Anna Wagner. Doctor Denehy's certificate accompanied each payment. The signature was by decedent's mark and testimony failed to fully disclose for what purpose the $1,900 was withdrawn, although it shows that part of it was expended for the installation of modern sanitary fixtures in the house.

Proof is lacking that the decedent requested the attendance of an attorney. The brother Chris, for whom decedent expressed solicitude, and who had lived in the home for twenty-five years, was not present and was not informed upon his return home from the hospital that a will had been executed. There is proof that the decedent was unable to read; it was testified that the will was read aloud to her. No explanation is offered why the propounded paper disinherited the principal object of her bounty, except as testified by the attorney. It is unreasonable to believe that the decedent would understandingly approve a paragraph in a will that gave nothing to the brother, while protesting that she wanted to provide for him. An explanation is demanded. It required of the proponent some proof in addition to that which will ordinarily suffice. In cases of persons who are ill, as well as in cases of illiteracy, there is no presumption that they know what they are doing. The knowledge of the contents of a will and the character of the paper have to be proven. There was the ordinary proof of the factum of the will. But, in this case, the proponent is required to show that the testatrix had an intelligent knowledge of the contents of the will, which has not been shown by the evidence of the three witnesses to the will. There must be proof that she knew its contents and that it expressed her intention.

Did this sister who had lived with the brother twenty-five years mean to fool him by giving him something that she understood was worthless? If she thought anything at all, she must have had the idea that she was creating an enforcible covenant or trust for him for life. The lawyer, however, testified that he explained to her that the drafted words were meaningless, and that she understood it.

Chris Reilly, the brother, was the natural object of the decedent's bounty. The decedent was one of the closest and nearest to him during her life, and, when the will excludes such object, it may be concluded that the instrument is unnatural. The relation of the brother to the decedent was such as to give him a claim on the decedent's bounty.

The conflict of evidence is clear. Was the decedent competent to make a will? Was she mentally capable of forming a decision as to the disposition of her property and of recalling her decision

throughout the disposition of it? Could she comprehend the legal character of her intended gift to the brother Chris? Did she have a mind capable of understanding the nature of her act and its consequences?

The contestants claim that the proponents failed to establish due execution of the will, because, the decedent being illiterate, not able to read, there is no evidence that she understood the contents of the instrument signed by her; that there is fraud by imposition. This is a serious objection.

It is essential to the validity of a will that, at the time of its execution, the testator should know and approve of its contents. One of the issues relates to the knowledge of the contents of this particular will by the testatrix. Strong proof is required that the contents of the will were known to the decedent. The ordinary presumption that the formal execution of a will imports knowledge of the contents cannot prevail where the testator is of a low grade of capacity, or illiterate. A different degree of proof is required in order to satisfy the court that the instrument contains the real intention of the deceased.

The issue of fraud is one of the elements of undue influence and sometimes is pleaded distinct from the charge of undue influence. (*Matter of Hermann*, 87 Misc. 476.)

Among the variety of terms used in discussing the instant question, we may refer to one as " subversion of intention," " imposition," " misrepresentation," amounting to undue influence. In such cases, probate will be denied. In order that the instrument may be held to be a valid will, it is essential that the decedent should have knowledge and understanding of its provisions. If the decedent did not know or comprehend its provisions, then probate must be denied. If the provisions of the decedent's will were framed in such a way as to mislead the decedent and dispose of the estate otherwise than in accordance with her understanding, probate will be denied. The principle of law declared in *Evans* v. *Trimble* (169 App. Div. 363; appeal dismissed, 217 N. Y. 701) applies to the instant case. The brother Chris could legally compel the use of the property for his life which decedent clearly intended him to have. The decedent, most lay persons, and many lawyers would fail to understand the legal significance of the precatory language used in the 4th paragraph, if it was read aloud in their presence.

Again, *Matter of Woods* (189 App. Div. 324), Second Department, Presiding Justice JENKS writing, dealt with a case of a paper writing which did not exclude any natural object of the testator's bounty. The court was careful to say: " Quite a different question would

have been presented if the mistake had excluded a natural object of bounty." The instant case comes within the "different question" presented, particularly when the paper writing excluded the natural object of her bounty, while decedent intended to provide for the natural object of her bounty.

Undue influence, apart from imposition, it is sometimes said, is inconsistent with the lack of testamentary capacity, but in this case it is immaterial because the act amounts to a legal wrong, either against the testatrix or a naturally expectant beneficiary. In the instant case, the testimony of Miss Campbell is to the effect that the decedent wanted the brother legally protected and cared for. It was not done. Thus, an irresistible inference of fraud is created, amounting to undue influence. The weakness of the testatrix and the opportunity were present as a fact.

The evidence of fact surrounding the testamentary act would justify the inference that fraud had been exercised.

The court must be satisfied with the genuineness of the will and the validity of its execution. It is not satisfied that the will is genuine, or that the testatrix signed a paper writing which she understood. The contestants have sustained the burden of proof imposed upon them as to the issue relating to fraud.

I have also reached the conclusion that the issue of mental capacity must be decided in favor of the contestants. The burden of proof as to mental capacity cast upon the proponents has not been met and grave doubts in my mind remain unremoved.

The propounded paper is denied probate.

Submit decree accordingly.