[Civ. No. 14080. Second Dist., Div. Three. Dec. 21, 1943.]

Estate of OLIVIA SOFIA JOHANSON, Deceased. JOHAN AUGUST JOHANSSON WEINER et al., Appellants, v. HELEN JOSEPHINE SMITH et al., Respondents.

Walter G. Danielson for Appellants.

Birger Tinglof and Roscoe R. Hess for Respondents.

SHINN, J.—This is an appeal from a judgment of nonsuit in a contest, after probate, of the will of Olivia Sofia Johanson. Contestants are the four brothers, two nephews and a niece of decedent. The original grounds of the contest were unsoundness of mind, undue influence, and that the will had not been duly subscribed and witnessed. At the close of contestants' case they were allowed to amend their petition by the addition of allegations that Mrs. Johanson did not know or understand the terms and provisions of the will or understand that it was her last will and testament, and the allegation that she was suffering from insane delusions.

It is insisted by the contestants that they made out a sufficient case to go to the jury as to all of the grounds of contest, except the one of nonexecution, and there are also assignments of error in the exclusion of evidence. A consideration of the evidence in the light most favorable to contestants (*Estate of Newhall* (1923), 190 Cal. 709, 719 [214 P. 231, 28 A.L.R. 778]) has convinced us that contestants produced no evidence which would have justified a verdict in their favor upon any ground of contest.

The following summary states the substance of the evidence which tended to support the charges of unsoundness of mind, the allegations of lack of knowledge and understanding and of insane delusions, added by the amendment. Mrs. Johanson was a native of Sweden who had come to America in 1907 at the age of 22 with her twin sister Emma. She married in that year, some five years later she and her husband came west, and he died of cancer in December, 1939. She frequently corresponded and was on good terms with Emma and with her other relatives who lived in Sweden. She could read some English but usually corresponded in Swedish.

In January, 1939, decedent became a patient of Dr. John Doyle, an eminent specialist in nervous and mental diseases, who testified that he diagnosed her case as one of ''depressive psychosis which is a form of insanity. [We shall refer later

to what he meant by the term.] She was melancholy to a decree that was abnormal. Her power of concentration was materially diminished. She was unable to subtract 7 from 172. She knew the day of the week; stated the month was January. She stated the date was the 2nd, whereas it was the 9th. She stated the year was '32 where it was really '39. She had suicidal ideas, stating that she would 'like to go for my husband's sake.' '' She was sent to a sanitarium for a few weeks under treatment by Dr. Doyle; he later gave her a treatment in June, 1939, and a final one in the following October, to relieve the depression in her melancholy state. Dr. Doyle examined her again in February, 1940, found her to be suffering from cancer of the breast and from an ''obsession compulsion neurosis and anxiety'' but no longer in a ''depressive sickness.'' At that time pictures disclosed two fractures of the pelvic bones, due to the cancerous condition, and which would have occurred with relatively little pain. There was a healing process under way. Dr. Doyle saw her in March, August, September, October and November, 1940, and on January 2, 23, 25 and February 1, 8, and 12, 1941. In October she had obsessional ideas and she consistently complained of pain and tightening in the back of her neck. She was conscious of her heart beats through the blood vessels to the head and complained of that condition. She entered a sanitarium in September, 1940, and remained there until her death on February 15, 1941. Her nurse testified that in the latter part of January she had spells of vomiting but walked about her room, and on January 27th was outdoors in a wheel chair and walked in the hall; on January 28th she had a vomiting and coughing spell and appeared ''very cyanotic, which is a bluish color that people get before they are about to die,'' but shortly thereafter took a walk in the hall and had visitors; thereafter she was out of bed in a wheel chair or walking about the room each day to and including February 4th, when she walked in the hall and her room in the morning and again at 4 o'clock in the afternoon. It was in the afternoon or evening of February 4th that she executed the will, with her nurse, Madlyn Smithson, and her attorney, Oscar W. Houge, as witnesses. On February 5th she had her lunch while sitting in a chair but ate very little and was crying and nervous. She conversed with her nurse, so the latter testified, until within three days of her death.

Dr. Doyle testified that he examined Mrs. Johanson on February 1, 1941, and that she was losing ground physically. He testified that on February 1st she understood what he was telling her, "the technical terms," and that their conversation "was of people in middle life, and discussing a difficult problem on her part," and he also testified as follows: "Q. At that time when you examined her February 1st, 1941, what was her mental condition? A. Her mental condition was clear enough and she talked well. Q. That was true of all your prior examinations? A. Yes, sir. Q. Her memory was fair? A. Yes. . . . Q. After October, 1939, it is true that she was sane even in your own medical definition? A. That is right." He testified that by February 8th a state of stupor or blunting of her mental faculties had arisen since February 1st, and expressed the opinion that on February 8th she did not have sufficient mental capacity to understand the nature and situation of her property or her relations to the persons who might have claims upon her bounty and that this was due to the condition of stupor. He also testified that he could not say with any degree of certainty when that degree of stupor had first manifested itself.

Witnesses who had been close to Mrs. Johanson testified to her conduct and statements in 1938 and thereafter, which we summarize as follows: In the latter part of 1938 she for the first time lost interest in her personal appearance, began to smoke cigarettes incessantly and to drink beer, one witness testifying that on one occasion she smoked five packages of cigarettes between dinner and bedtime, and another that she smoked five or six packages a day and drank seven or eight bottles of beer a day. She left cigarette stubs on the floor, and would bite the heads off matches and chew the match stems or place them in patterns around a coffee table. On one occasion she ate all the cube sugar in a bowl and when it was refilled ate what had been added. Sometimes on a streetcar she would make a face at someone, putting her fingers in her mouth and stretching it wide; she would take out her dental plate and handle it and appear in her back yard in her pajamas and bathrobe, pull flowers off the bushes and cut up the petals. She complained that her head felt as if it had wheels grinding in it, and in 1940, after her husband's death stated, "I am nervous—— I killed him, I killed him. Everyone is sorry for him but no one is sorry for me." She talked

to herself, tore up small pieces of paper and threw them at a woman who was working for her, would have breakfast in bed because she said she was too ill to get up, but would arise after breakfast. She talked constantly of her troubles; she received an electric treatment by a physician and afterwards stated that the machine had broken all of her bones and dried up all the blood in her bones. She stated that she was going crazy and that she could hear voices. She always refused to listen to the radio because it annoyed her. She at times avoided her neighbors and at least one witness testified that her eyes appeared glassy. Most of the foregoing testimony related to the years 1939 and 1940. Upon one occasion in 1940 she stated to her attorney that she had been unfriendly with her sister Emma and had not corresponded with her at one time for about twenty years. The attorney who drew the will testified that Mrs. Johanson had discussed with him on several occasions the matter of making a will; that on February 4, 1941, he went to the sanitarium at her request about 9:30 a. m., received instructions as to the terms of the will, prepared it during the day and returned with it the same afternoon; that he handed it to her while she was seated almost erect in bed, that she put on her glasses, looked at the will page by page, asked a question as to the meaning of a legal term in the will, stated that she had finished reading it, and in answer to an inquiry said she wished the nurse and the attorney to act as witnesses. The attorney, according to his testimony, asked her to read the will a second time, she again looked at it page by page, and finally said, ''I have read the will again'' and stated it was the way she wanted it, whereupon it was subscribed by her and the witnesses. The original will, at Mrs. Johanson's suggestion, was kept by the attorney and a copy was placed in an envelope, which, at Mrs. Johanson's request, was put in a wardrobe by the nurse. The will was not read to Mrs. Johanson nor did she read it aloud or discuss any of its particular provisions.

There was no expert testimony and no opinion evidence of acquaintances that Mrs. Johanson was of unsound mind on or prior to the date of the will. The eminent specialist who had examined and treated her at various times over a period of two years, and who was in a better position than anyone else to express an informed opinion as to her mental faculties, testified to no mental disorder other than a condition

of "depressive sickness" which passed away considerably more than a year prior to the date of the will. The only condition indicative of loss of memory or the power of concentration was the one which he found when he first treated her and from which she recovered. The testimony of the physician as a whole was contrary to the contention that she was at any time of unsound mind, except as to a single occasion four days after the will was executed, when she was found to be in a debilitated physical and mental condition. He explained the use of the word "insanity" in connection with his diagnosis in 1939 as describing "a protracted departure of the individual in his acts, thinking and religion out of harmony with his education and cultural opportunity," and, as already noted, expressed the opinion that after October, 1939, at the times of his several examinations Mrs. Johanson was sane even according to his medical definition. In view of his testimony, the certificate of death which had been signed by him and which stated the cause of death to be "carcinoma of the brain with multiple cervical metastases" cannot be distorted into an opinion that the functioning of the brain had been impaired.

■ We should first determine whether the mental powers of Mrs. Johanson had failed to such an extent that she could not make a valid will. The test, which is not a difficult one to meet, is that one has testamentary capacity "if he is able to understand and carry in mind the nature and situation of his property and his relations to his relatives and those around him, with clear remembrance as to those in whom and those things in which he has been mostly interested, capable of understanding the act he is doing, and the relation in which he stands to the objects of his bounty." (*Estate of Motz* (1902), 136 Cal. 558, 562 [69 P. 294] ; 26 Cal.Jur. 639.) A more rigid test would invalidate many wills, for it is of common knowledge that the making of wills is often deferred until the testator is in contemplation of impending death through old age or sickness. As a consequence many wills are made, and validly made, by those who no longer have ability to conduct their business affairs because of loss of mental vigor or partial loss of memory. Extreme care should be exercised in applying the settled rules to the facts of a given case, as a decision at variance with those rules would set an unfortunate precedent. We have therefore con-

sidered it necessary to indulge in a somewhat detailed statement and analysis of the evidence.

■ We are satisfied that Mrs. Johanson was shown to have had testamentary capacity. She was suffering from physical rather than mental disorders. She was only 54 years of age at the time of her death and she had experienced no general loss of memory or of ability to concentrate and to reason. Her mental faculties were alert, if somewhat peculiar. There was no general debility either physical or mental which was indicative of senility. There was no evidence that at any time preceding the execution of her will she was unable to understand and attend to her business affairs, although it is apparent that she must have had some responsibility in that connection. The undisputed testimony was that she examined her bills and wrote checks until a few days before her death. If the disease which had affected various parts of her body had also attacked her brain, there was no evidence of any accompanying change in her mental condition. There was no evidence of progressive mental failing. She understood her condition and was greatly worried and depressed over it, but her worry was only natural and was not an evidence of mental illness. There was no evidence of general mental weakness from which it could be reasonably inferred that at any time she was without ability to recall the size and nature of her estate, which does not appear to have been extensive, or the ability to exercise reasonable judgment as to a simple plan of testamentary disposition that would favor those of her relatives and friends whom she considered to be most deserving.

■ The unusual statements and beliefs of Mrs. Johanson hereinbefore enumerated are relied upon by appellants as manifestations of insane delusions. But if given their greatest significance the eccentricities were not inconsistent with the existence of testamentary capacity. Peculiar and unusual conduct and the possession of false beliefs frequently accompany physical afflictions, but something more than that is required to render one incapable of making a valid will. ■ The right to dispose of one's estate by will is not confined to those whose mental powers are unimpaired and whose conduct and beliefs are normal and, from a medical viewpoint, sane. ■ Testamentay capacity is not destroyed by mere false beliefs or departure from normal thought or action, nor even by insane delusions or hallucinations that do not bear directly upon and influence the terms of the will. (*Estate of Mc-*

*Donough* (1926), 200 Cal. 57, 61 [251 P. 916]; *Estate of Wright* (1936), 7 Cal.2d 348 [60 P.2d 434]; *Estate of Nolan* (1938), 25 Cal.App.2d 738 [78 P.2d 456]; *American Trust Co.* v. *Dixon* (1938), 26 Cal.App.2d 426 [78 P.2d 449].)

 Mrs. Johanson suffered pain which she said gave her the feeling of wheels grinding in her head. She stated that her bones had been broken and her blood dried up by the electric treatment she had received. Perhaps these were poor attempts to explain the nature of her feelings, but her pelvic bones had been broken and the distress which she felt, while perhaps not lucidly described, was not imaginary. Her turning to excessive smoking and acquiring a fondness for beer did not bring her into a state of insanity nor to the verge of it, any more than did the breaking and chewing of match stems and placing them in patterns around a coffee table. These were expressions of a nervous condition, the causes of which were to be found in the state of her physical health. It did not appear in the testimony that anyone had endeavored to reason her out of her ideas nor was there any evidence tending to show that she possessed false, much less insane, delusions which bore any relation whatever to the existence of testamentary capacity or which would in any manner have influenced the terms of her will. It is true that the attorney testified that Mrs. Johanson had said that for one period of 20 years she had not been on good terms with her twin sister and had not corresponded with her. It is also true that there was evidence that the facts were to the contrary. There was testimony to the effect that late in the fall of 1940, while she was in the sanitarium, she complained to her attorney that her sister and brother-in-law had come from New York to live with her; that they were staying at her house, she was paying all of the bills, had to buy everything, that they paid her no rent, and that she had to leave home because she could not get along with them. But there was no evidence that she and her sister were not on good terms at the time the will was made; according to the testimony of her attorney she said at that time that her sister had helped her and that she wanted to leave her $100 and no more. There was no evidence that at that time she entertained any false beliefs as to her sister's conduct or held any ill will toward her. The argument that she held some unreasonable and false belief concerning her past relations with her sister would have had considerably more plausibility if the four brothers had

been given more than the sister. ■ The will referred to Helen Josephine Smith as a trusted friend and faithful employee of her deceased husband and herself in their business enterprises and as one who had been of great assistance both as an employee and as a friend, and these were the reasons she gave for making Miss Smith the principal beneficiary of her will. There was no evidence that the facts were not as stated. Reference was made in the will to the four brothers who resided in Sweden, with whom she was on good terms. Two of them received nothing and the other two received Mrs. Johanson's clothing and wearing apparel, except a sealskin coat. Her silverware was left to a friend, Mrs. Charlotta Roseland of Los Angeles. The will was not an unnatural one. (*Estate of Nolan, supra,* 25 Cal.App.2d 738 [78 P.2d 456].) ■ A finding that she suffered from insane delusions would have been unjustified.

We have left for separate discussion the allegations added by amendment to the contest, that Mrs. Johanson did not know she was making her will or understand its contents. It appears to have been the theory of the contestants that the amendment alleged a ground of invalidity distinct from that of unsoundness of mind. If it had been intended to charge that Mrs. Johanson did not know or understand the contents of the will, or that it was her will, because she was mentally incapable of understanding it at the exact time she executed it, proof of that fact would have been admissible under the allegation that she was of unsound mind. If, upon the other hand, it was intended to allege that she had no knowledge or understanding of the contents of the will or that it was her will, even though she would have been able to understand it if it had been explained to her, the amendment was perhaps necessary to admit proof of such facts. In order to fully dispose of the contentions of appellants it is necessary to discuss separately the evidence relating to Mrs. Johanson's condition immediately before, at the time of, and after the execution of the will, to see whether there was any substantial evidence of want of testamentary capacity; also the circumstances in evidence as to the execution of the will, to see whether there was any evidence that she did not know she was making a will or did not understand its contents.

■ We have already stated the testimony of Dr. Doyle as to Mrs. Johanson's mental and physical condition on February 1st. No other witness, except her nurse, testified to her

condition on that day and as the evidence was all one way we think it must have been accepted as a fact that her mind was clear then and that she would have been able to understand the terms of her will. No witness testified to any failing of her mental faculties between that time and the execution of the will. We have already alluded to the testimony that she was out of bed and walking about and conversing with her nurse each day. The testimony of the attorney was that he had two conversations with her on February 4th. On February 6th she was visited by her sister Emma and the latter's husband. They testified that at first she did not recognize them but then said softly, "Sister here, sister here," and that she could not say anything else. Her sister stayed with her for some time during the morning and returned in the afternoon. She testified that Mrs. Johanson did not recognize her in the afternoon, that her eyes were glary, and that she did not respond to the touch of her hand. A Mr. and Mrs. Roseland. testified that they visited Mrs. Johanson on February 6th, found her lying motionless, and that they did not believe she recognized them, although she endeavored to speak. They remained only 10 or 15 minutes. It is to be recalled that Dr. Doyle testified that her mental condition on February 8th was due to stupor, which had come on since February 1st, and that he was unable to express an opinion as to when she had fallen into that condition. There was no evidence that she was in a condition of stupor or that she was not mentally alert on February 4th. If it be contended that between February 1st and February 4th she became incapacitated through the onset of extreme stupor or coma, the proof failed to establish that fact. A finding by a court or jury that that condition existed earlier than February 6th would be wholly unsupported by the evidence. If there had been testimony that she had been in a state of coma on February 4th before the will was executed or on a previous day, there would have been some reason to believe that that condition had persisted. Of course it can be said that the testimony of Dr. Doyle, the attorney and the nurse need not have been accepted in its entirety but contestants cannot make out an affirmative case by throwing out the evidence which was unfavorable to them. There was no substantial evidence that Mrs. Johanson was unable, because of her physical or mental weakness, to understand that she was executing her will or to comprehend the contents thereof.

The theory which prompted the amendment, and which must not be confused with the one just discussed, suggests something different from want of testamentary capacity, namely, that Mrs. Johanson did not know that the document was a will or did not know its terms.

The attorney who drew the will had known Mr. and Mrs. Johanson for some 20 years. He was called under section 2055 of the Code of Civil Procedure as executor of the will and an adverse party. There was no evidence that the will had not been duly executed by Mrs. Johanson and subscribed by the witnesses. And if the testimony of the attorney should be entirely disregarded there would be no evidence that Mrs. Johanson did not know that the document was her will or that she signed it without reading it or read it without understanding it. It may be granted that she could not have made a valid will without having knowledge of what it contained (see cases 68 C.J. 606, sec. 226) but it was to be presumed from the fact that she signed it that she had read it and knew its contents (see cases 68 C.J. 984, sec. 751). In the ordinary course of business people acquaint themselves with the contents of their wills before executing them, and it is to be presumed that Mrs. Johanson did so. (Code Civ. Proc., sec. 1963, subds. 20 and 28.) A will shown to have been signed by the testator and subscribing witnesses gives rise to a presumption that it has been duly executed (*Estate of Braue* (1941), 45 Cal.App.2d 502 [114 P.2d 386]) and it would seem that the presumption of due execution should be extended under the same rule to include knowledge of the contents. The burden of proof upon the issue raised by the amendment was upon the contestants. They were required to produce affirmative evidence that the testatrix did not know or understand the contents of the will, and there was no such evidence. It did not appear that she had intentions which were not expressed in the will or that she was suffering from any mistake as to its contents. The fact that the attorney was familiar with Mrs. Johanson's estate, and was in possession of other information which would have enabled him to draw the will without specific directions from her, which appellants emphasize, or a doubt as to the correctness of his testimony in any respect would not be evidence that he did draw it without her directions or that it expressed his desires and not hers. Mere weakness in the proof that a will is valid does not constitute affirmative

evidence that it is invalid. A contestant's case must be judged independently, and must be found to have sufficient strength to justify a finding in his favor before the proponent is called upon to produce any proof. (*Estate of Stone* (1943), 59 Cal.App.2d 263, 268 [138 P.2d 710]; *Estate of Latour* (1903), 140 Cal. 414, 420 [73 P. 1070, 74 P. 441]; *Estate of Relph* (1923), 192 Cal. 451, 458 [221 P. 361].) This separate ground of contest was wholly unsustained.

The charge of undue influence was that the attorney, Oscar W. Houge, and Helen Josephine Smith conspired to and did subject Mrs. Johanson to their own wills and that the testamentary document was signed solely under the influence, domination and dictates of said Houge and Smith. So far as shown, Miss Smith did not discuss the proposed will with Mrs. Johanson or Houge. There was no evidence whatever that Houge made any request or suggestion as to the terms of the will. He was named as executor but was not a beneficiary and it was not shown that he would have profited in any way from the share of the estate taken by Miss Smith. There was no evidence, direct or circumstantial, to support the allegations of undue influence.

In view of the insufficiency of the evidence to support a verdict for contestants, it would have been error to submit the case to the jury.

Contestants offered to prove in support of the charge of undue influence that Mr. Houge and Miss Smith were beneficiaries under the will of Mrs. Johanson's deceased husband. The evidence was objected to and was refused admission. It was not relevant to the question of the use of undue influence in the making of Mrs. Johanson's will and the ruling was not erroneous.

Contestants also offered to prove that testatrix' sister, Emma Nystrom, had filed a contest upon grounds identical with those on trial and that it had been compromised. An objection was sustained and the ruling is assigned as error. In the writing which evidenced the settlement it was stated that neither Miss Smith nor Mrs. Nystrom made any admission as to the soundness or unsoundness of mind of Mrs. Johanson, and the agreement was to be effective only if the validity of the will should be established. It is now contended that the settlement, to which the executor was a nominal party, would have furnished support for an infer-

ence that respondents Houge and Miss Smith were guilty of the charges made against them. The objection was properly sustained. ▮ An offer of compromise is not an admission that anything is due (Code Civ. Proc., sec. 2078) and evidence that a compromise has been offered is not admissible as proof of liability. ▮ Compromises are favored in law and a man is allowed to negotiate for the purchase of his peace without prejudice to his rights. ▮ Probate contests have a special appeal to the spirit of compromise for the preservation of family ties and the adjustment of equities which the courts are powerless to arrange. The argument that one who surrenders some of his rights under a will in order to avoid litigation must have obtained them wrongfully would be an appeal to prejudice which could not be sanctioned. The agreement of compromise offered in evidence would have tended to prove no material fact in the case but would have confused the minds of the jury in the decision of the issues of mental capacity and undue influence. Had it been admitted without objection it would not have strengthened the case of the contestants.

▮ The court properly sustained an objection to a question which called for Dr. Doyle's opinion as to the mental condition of testatrix on February 4th. The witness had already made it clear, in answering a question of the court, that he had no definite opinion as to her condition on that day because he had not seen her. The facts assumed in the question were wholly insufficient as a basis for an opinion.

The judgment is affirmed.

Desmond, P. J., concurred.

BISHOP, J. pro tem.—I dissent. There was a crucial question in this case which, in my judgment, the jury should have been permitted to answer. The question was not in the case when the trial began. Interestingly enough, the allegations concerning it were added "to conform to proof," yet a nonsuit was granted on the ground that they had not been proved. The question was this: Did Mrs. Johanson know the contents of the document which was probated as her will? The contention that she did not, constituted a valid ground of contest. Section 371 of the Probate Code, which follows closely the last half of former section 1312 of the Code of Civil Procedure, which it supplanted, serves to give us the

grounds upon which a will may be contested (*Estate of La-tour* (1903), 140 Cal. 414, 419 [73 P. 1070, 74 P. 441]). In addition to the more familiar grounds (incompetency, undue influence, and lack of due execution) we find that there may be raised: "Any other question substantially affecting the validity of the will." Such a question is presented by the allegations of the amendment to conform to proof. As this conclusion has not been questioned by the respondents, has been "granted" for the purposes of the majority opinion, and seems to me to be both sound and soundly established, although barely touched upon in California, I content myself with these citations in its support: *Estate of Eklund* (1932), 186 Minn. 129 [242 N.W. 467, 468]; *In re Reilly's Will* (1931), 139 Misc. 732 [249 N.Y.S. 152, 158]; *Hogan* v. *Whittemore* (1932), 278 Mass. 573 [180 N.E. 526]; *In re Bose's Estate* (1939), 136 Neb. 156 [285 N.W. 319, 330]; and see review of evidence in *Estate of Relph* (1923), 192 Cal. 451, 461 [221 P. 361].

I agree with the explicit premises of the majority opinion, that the contestants had the burden of proof; they had to show, affirmatively, that the contents of the will were not known to Mrs. Johanson; that it was not enough to impeach the nurse and the attorney, the two subscribing witnesses and the only persons who testified to seeing Mrs. Johanson on the day the will was executed. There is, however, a premise implicit in the majority opinion, with which I do not agree. It is that an affirmative showing must be made by direct evidence; that it may not be done by indirect evidence. If this were the law no contest could be successful where the execution of the will was not witnessed by someone other than the subscribing witnesses. Moreover, it would make meaningless the well recognized rule that in examining the evidence upon the review of an order granting a nonsuit, every reasonable inference in favor of the contestant which the evidence permits must be accepted, and all contradictory inferences and contrary direct evidence must be rejected. (*Estate of Burre* (1940), 38 Cal.App.2d 518, 520 [101 P.2d 549]; and see many quotations in *Estate of Ivey* (1928), 94 Cal.App. 576 [271 P. 559].) At this point it should be further observed that as a jury may credit some statements of a witness whose declarations concerning other matters they disbelieve (*People* v. *Smith* (1940), 15 Cal.2d 640, 648 [104 P.2d 510]), so on

the review of an order granting a nonsuit the portions of a witness's story which favor the contestants should be accepted, and the unfavorable portions rejected.

Applying these firmly established principles there appears to me to be evidence of sufficient substantiality to have warranted the submission of the case to the jury on the ground of contest that Mrs. Johanson did not know the contents of the probated will. The jury would have been fully justified, had they been given the chance, in concluding that the stupor in which the doctor found Mrs. Johanson at 9:30 a. m. on February 8th, was fairly descriptive of her condition during February 6th. In the morning of that day both Mr. and Mrs. Roseland, good friends of Mrs. Johanson, were with her for fifteen minutes. They testified that they were of the opinion that she did not recognize them, and that her larynx moved but she was too weak to talk, nor did she move her hands or arms or turn her head. In the morning of the same day Mrs. Johanson's twin sister and the latter's husband called upon her, and found her in the condition described by the Roselands, except that, after ten minutes, in spite of Mrs. Johanson's inability to speak, her sister heard the words: "Sister, here, sister, here." Calling again in the afternoon, the sister was not recognized.

The picture before the jury was not that of a woman suddenly stricken. The doctor who found her in a stupor on February 8th at first thought that it might be due to the effect of a bromide, but "Her subsequent progress" led him to the conclusion "that she was actually suffering from multiple metastases in the brain." Cancer spreading throughout her system over a period of months was bringing about a steady deterioration in her condition. Knowing how far gone she was on February 8th, and on February 6th, twelve jurors, bringing their combined experiences to bear upon the problem before them, might with reason have concluded that on February 4th, Mrs. Johanson, though not then advanced to the stuporous stage where she neither moved nor spoke nor recognized her friends, nevertheless was so weak and near the stuporous stage that she could not and so did not arouse herself to read or comprehend the two pages of a document she had never seen before, written in English, a language which she could read "a little."

If the testimony of the attorney who drew the will had to be accepted by the jury then Mrs. Johanson's inability to

read it over and learn its terms would not necessarily be fatal to its validity. According to his testimony, he had called in the morning of February 4th at 9:30, although possibly rather than probably earlier, and learned what its terms were to be, so that, when he returned with the typewritten document in the afternoon, she could be said, in the absence of some evidence to the contrary, to have known its contents. But the jury could, with reason, have concluded that the facts were not just as he related them. In the first place, remembering the statement in his deposition that on two previous occasions Mrs. Johanson had told him that she was going to leave everything to Helen Smith, whom he knew well, they may have doubted more than just his uncertainty as to who the Helen was to whom she referred, that morning of February 4th, as, in a half hour's conversation about her health and other matters, she told him, according to his story, how she wished her will drawn. They may have believed the nurse's testimony, rather than his, concerning the half hour of events about 9:30 a. m. of February 4th, she having testified, from her chart, that "At 9:30 she had some water. She was vomiting and her emesis was a yellow froth."

The nurse, whose only patient was Mrs. Johanson, refreshing her recollection from the chart, made no mention of the visit of the attorney who testified to the drawing of the will unless it is included in her statement: "At 7 [p. m.] she was sleeping and had a visitor." From the chart and the nurse's testimony the jury could with reason infer that there was but one caller upon Mrs. Johanson on February 4th, and that he was the attorney who came with a prepared will, early in the evening, and that he had not been there before that day. According to his own testimony he did not read the document to her nor engage in any exposition of its terms. Whatever knowledge of its contents she had she acquired herself. The jurors, given the opportunity, would not have shocked reason had they determined that under all the circumstances Mrs. Johanson never did learn the terms of the document which became her witnessed will. The issue should have been submitted to the jury; it was error to grant the nonsuit as to the ground of contest which was added to conform to proof.