Van Voorhis, J.
This is a contest between the two daughters of Elizabeth M. Creekmore over the proceeds of two savings bank accounts aggregating about $15,000, which belonged to Mrs. Creekmore, and constituted about three fifths of her assets at the time of her decease. Letters testamentary have been issued to Mrs. Howland under Mrs. Creekmore’s will executed *287 October 31, 1949, whereby these two bank accounts were given as follows: “I give and bequeath unto my daughters, Nana At.fixta Ogg and May E. Rowland, my bank accounts in the Emigrant Industrial Savings Bank, 5 East 42nd Street, Borough of Manhattan, New York City, 17, New York, and in the Franklin Savings Bank, Eighth Avenue and 42nd Street, Borough of Manhattan, New York City, New York, share and share alike, absolutely and forever.”
This bequest was the only gift made to Mrs. Ogg by her mother’s will. Mrs. Rowland has not charged herself as executrix with the proceeds of these savings bank accounts, however, and claims them as entirely her own property due to the circumstance that on November 28, 1951 they purport to have been placed in joint account with her by her mother. The circumstances under which this change was made will presently be discussed in greater detail, because the decision of the appeal hinges upon them. Mrs. Ogg objected in this respect to the judicial settlement of Mrs. Rowland’s account as executrix, and insists that these bank accounts be distributed as part of her mother’s estate so that she may obtain half of them under the bequest which has been quoted. The issue is whether these funds pass under the will or to Mrs. Rowland as survivor under section 239 of the Banking Law. This question is to be resolved by whether Mrs. Creekmore validly established them as joint accounts so as to bring them within the operation of that statute. This depends upon what happened on November 28, 1951 when she signed the signature cards transferring the form of these deposits from her own name to the names of herself and Mrs. Rowland.
Fatally stricken with cancer, and suffering from a broken thigh, Mrs. Creekmore was in her final illness at the Lenox Trill Hospital in New York City. On the previous day a letter had been written at her behest by Mrs. Rowland to Mrs. Creekmore’s attorney, William Matthews, which stated:
11 My mother, who is quite sick and a patient at Lenox Hill Hospital, has asked me to contact you to help in getting the necessary forms put through to give me complete power-of-attorney on the following bank accounts so that I may be able to pay her bills if and when necessary. Probably under name — Elizabeth M. Creekmore.
*288 (This one primarily) Guarantee Trust Co.
60th St. and Mad. Ave.
Emigrant
42 St. between Mad. and
5th Ave.
Franklin
8th Ave. and 42 St.
Empire
125 St.
‘ ‘ My mother has also requested that I be deputized to open her safe deposit box if and when necessary and I would appreciate it very much if you can obtain that form for me too. The box is No. 882 and is in the Guarantee Trust Co. 60th and Mad. Ave.
“ My Father sends his best regards and asks me to tell you that he too would appreciate it very much if you would take care of this for us. He is not well himself.”
Upon receipt of this letter on November 28,1951, Mr. Matthews procured forms of power of attorney from the Guaranty Trust Company enabling Mrs. Rowland to draw upon Mrs. Creek-more’s account and to have access to her safe-deposit box. These powers of attorney were signed by Mrs. Creekmore and forwarded by her attorney to the Guaranty Trust Company. This was done simultaneously with the transactions in suit.
It was a different story at the Emigrant and Franklin Savings Banks. When Mr. Matthews arrived there as Mrs. Creekmore’s emissary and requested forms for power of attorney according to her request, he was told in each instance that the bank was opposed to accepting powers of attorney, that they did so only under protest, that they had no power of attorney forms available, and recommended that the accounts be changed to joint accounts in the names of decedent and Mrs. Rowland who was to have been the grantee of the powers of attorney. This policy on the part of these savings banks did not concern the welfare or purposes of Mrs. Creekmore, but was designed to protect the banks against inadvertently cashing checks drawn by the attorney-in-fact of a decedent. Everyone knew that Mrs. Creek-more was not long for this world. These banks evidently did not notice or care that the course of procedure which they were recommending would materially alter the devolution of these accounts upon Mrs. Creekmore’s decease.
*289 Mr. Matthews promptly took the signature cards which the Emigrant and Franklin Savings Banks had prepared to transfer these funds into joint accounts, along with the forms for powers of attorney which he received from the Guaranty Trust Company, to the Lenox Hill Hospital, where he met Mrs. Rowland in the afternoon of the same day on which he had received her letter. After Mrs. Rowland signed the signature cards, she and Mr. Matthews went upstairs to Mrs. Creekmore’s room with a notary public whom Mr. Matthews had brought with him. After the notary had been introduced to Mrs. Creek-more, Mrs. Rowland and the notary retired from the room at Mr. Matthews request for a period of from five to ten minutes to enable him to confer with Mrs. Creekmore alone before she signed the papers. Following this brief private professional interview, Mrs. Rowland and the notary were again called into Mrs. Creekmore’s room, the upper part of her hospital bed was rolled up so that she came partially into a sitting position, Mrs. Rowland put an arm around her back so as to assist her to write her name, and these signature cards were signed respecting the savings bank accounts and the powers of attorney upon the Guaranty Trust Company. The only witness who testified to this incident or to Mrs. Creekmore’s condition was Mr. Matthews, who knew that “ she was very, very seriously ill ” from cancer and a broken thigh. Whatever legal advice he may have given to Mrs. Creekmore during the five or ten minutes while they were alone before the others were recalled to help her sign the papers, was excluded as a confidential communication between attorney and client (Civ. Prac. Act, § 353).
In his decision the Surrogate found as a fact that Mrs. Rowland “ has not shown that the alleged joint accounts were knowingly and consciously created and sanctioned by her mother ”, but the Appellate Division reversed “ on the law ” at the same time stating in the order that “ the findings of fact are hereby affirmed ”. This included an affirmance of the finding that these joint accounts had not been shown to have been knowingly and consciously created and sanctioned by decedent, unless the uncontroverted evidence established that they were thus created. The Appellate Division appears to have based its reversal and dismissal of Mrs. Ogg’s objections exclusively upon the circumstance that these accounts were in the form described by subdivision 3 of section 239 of the Banking Law. *290 The thought appears to have been that if they were put into the form prescribed by this statute, the effect takes place as a matter of course without further inquiry. The Appellate Division’s memorandum decision states: “ The evidence shows that the accounts and the deposits therein are in form described by subdivision 3 of section 239 of the Banking Law. Such evidence establishes conclusively the intention to vest title in the survivor to the moneys in the accounts at the time of death. ’ ’
The position of Mrs. Ogg is that the burden lay upon Mrs. Rowland to establish that their mother knew what she was doing when she signed these signature cards. She does not charge Mrs. Rowland with having schemed to subvert her mother’s intention, her position being just that the mother never knew that she was signing any such thing. Consequently Mrs. Ogg has not charged her sister with practicing fraud or undue influence. The burden is still upon Mrs. Rowland to show that it was her mother’s conscious act and deed. The Appellate Division held that she had sustained this burden due to the bare circumstance that the cards had been signed by her mother, in the absence of a contention that someone was trying to take advantage of her, concluding: ‘[1] There being no issue of fraud or undue influence, the survivor was not required to submit additional evidence as to the intention of the decedent. (Matter of Fenelon, 262 N. Y. 308; Moskowitz v. Marrow, 251 N. Y. 380.)"
The Fenelon and Moskowitz cases (Matter of Fenelon, 262 N. Y. 57; 262 N. Y. 308; Moskowitz v. Marrow, 251 N. Y. 380) involved no question of incapacity, lack of volition or mistake on the part of the creator of a joint account. Before the enactment of the predecessor statute to section 239 of the Banking-Law, the query had been suggested in some of the decided cases that more might be necessary to create a survivorship interest in a joint account than merely opening the account in that form (cf. Kelly v. Beers, 194 N. Y. 49; Schneider v. Schneider, No. 1, 122 App. Div. 774, 780). The Fenelon and Moskowitz cases put to rest that question, holding that under section 239 the executed intention to make a deposit “ in form to be paid to either or the survivor ” sufficiently evinced a purpose that the proceeds of such an account should belong to the survivor after the death of the other. Ordinarily the signature to joint deposit slips is sufficient evidence of an intention to make a gift to the survivor, *291 but the signature is merely evidence of an intention to make the deposit in this form. Where there is question concerning the competency of the depositor, or the genuineness of her act in creating the deposit, it is not made conclusive by section 239. Neither of these decisions involved the capacity of the depositor, or the closely related question of whether signing the signature cards was the true act and deed of the depositor. They merely dealt with the legal effect consequent upon the voluntary and intentional creation of an account in that form. Other principles apply where one has signed a signature card under the impression that it is a different kind of instrument, such as a power of attorney, where the signer is without fault in being ignorant of the contents (Pimpinello v. Swift & Co., 253 N. Y. 159). That was recognized in Matter of Buchanan (184 App. Div. 237, 239-240), in which the opinion says that the statutory language that title to the funds shall be presumed conclusively to be in the survivor “ in the absence of fraud or undue influence ” does not signify that this result is to occur if the deposit has been made without the consent of the owner of the money, even where there has not been undue influence. This idea was approved in Matter of Fenelon (262 N. Y. 57, 59, supra) where this court said referring to Matter of Buchanan: "Obviously, if the law were otherwise, then the whim or error of the banker, in writing the form of the deposit, or a direction by one who converted the moneys, might operate to transfer title of the true owner of the moneys, without volition on his part. The law does not countenance involuntary transfers of that character. ’ ’
The need to establish volition on the part of the depositor to make the deposit in the statutory form is thus clearly recognized in Fenelon, concerning which the burden of proof throughout is upon the survivor claiming to own the deposit on account of the death of the other alleged joint depositor. Absence of volition, due to incompetency or to excusable mistake concerning the nature of the instrument, should not be confused with subversion of volition by some self-seeker, which is undue influence or fraud. In the former instance there is no will or purpose to undertake the transaction, whereas in the latter the purpose exists but has been induced by some external, sinister agency. That is not claimed to have existed here, but the circumstance that Mrs. Rowland is not accused of having preyed upon her *292 mother’s weakness, which would have had to have been shown by Mrs. Ogg if fraud or undue influence had been charged, does not relieve Mrs. Rowland from the burden of establishing that their mother consciously and purposely did deposit these moneys to the credit of either or the survivor.
Opening these joint accounts, instead of continuing the funds in Mrs. Creekmore’s name as sole depositor, would have the ■ effect of drastically changing the testamentary disposition which she had made of these accounts two years before that was never superseded by the execution of any subsequent will. Only a short while before she signed these signature cards, she had requested powers of attorney which evinced no intention to change the devolution of these accounts upon her death, but would merely have empowered her daughter, Mrs. Rowland, to pay the large bills connected with her illness and other items for her account. The power of attorney which Mrs. Oreekmore succeeded in executing to Mrs. Rowland to draw upon her account in the Guaranty Trust Company accomplished. that objective respecting that account, and there is reason to believe that in her weakened condition she assumed that she was signing equivalent instruments providing for withdrawals from the Emigrant and Franklin Savings Banks for the same purpose, as had been requested in the letter which called for powers of attorney — not joint deposits — in the case of each of these bank accounts. It is improbable that during the five or ten minutes while she was alone with Mr. Matthews in her sick bed at the hospital, she changed her previous testamentary plan, without altering her will which gave half of each of these specific savings bank accounts to each daughter, and decided to disinherit Mrs. Ogg.
Under subdivision 3 of section 239 of the Banking Law, as in the probate of a will, the burden of proving fraud and undue influence is upon the contestant (Matter of Schillinger, 258 N. Y. 186). But the burden is always upon the proponent of establishing the competency of the testator and the genuineness of the will (Matter of Schillinger, supra; Rollwagen v. Rollwagen, 63 N. Y. 504; McLaughlin v. McDevitt, 63 N. Y. 213; Matter of Budlong, 126 N. Y. 423; Delafield v. Parish, 25 N. Y. 9, 35; Matter of Bedell, 107 App. Div. 284; Matter of Regan, 206 App. Div. 403; Matter of Mullin, 143 Misc. 256, affd. 240 App. Div. 996, affd. 265 N. Y. 491; Matter of Reilly, 139 Misc. 732; Weir v. Fitzgerald, 2 Bradf. 42, 68-69; Matter of Rintelin, *293 77 App. Div. 142; 2 Jessup-Redfield, Surrogates’ Law and Practice, § 925; 2 Warren’s Heaton on Surrogate’s Courts, § 187, subd. 2, par. [g]).
The circumstances which require additional proof to supplement the mere formal execution of the instrument vary with the vicissitudes of life. In a classic statement in Weir v. Fitzgerald (2 Bradf. 42, 68-69, supra), where the testator’s eyesight was impaired, the learned Surrogate said concerning the probate of a will: ‘ ‘ These forms are necessary, but, even when satisfied by the evidence, do not always entitle the will to be admitted to proof. Something more is necessary to establish the validity of the will, in eases where, from the infirmities of the testator, his impaired capacity, or the circumstances attending the transaction, the usual inference cannot be drawn from the mere formal execution. Additional evidence is therefore required, that the testator’s mind accompanied the will, that he knew what he was executing, and was cognizant of the provisions of the will.”
In Matter of Reilly (139 Misc. 732, supra), where the testatrix had sustained a stroke, Surrogate Slater wrote: - “ In cases of persons who are ill, as well as in cases of illiteracy, there is no presumption that they know what they are doing. The knowledge of the contents of a will and the character of the paper have to be proven. There was the ordinary proof of the factum of the will. But, in this case, the proponent is required to show that the testatrix had an intelligent knowledge of the contents of the will, which has not been shown by the evidence of the three witnesses to the will. There must be proof that she knew its contents and that it expressed her intention.” (p. 736).
Especially is this true, where, as in the present instance, Mrs. Creekmore might easily have been confused by the distinction between a joint account to the credit of either or the survivor, and a mere power of attorney which was all that she had sought and what she was evidently endeavoring to execute.
Surrogate Wingate wrote in Matter of Mullin (143 Misc. 256, 259, supra), affirmed without opinion in the Appellate Division and in the Court of Appeals, that“ placing the burden of proof in this regard upon the proponent as a part of his demonstration of the validity of the document * * * appears now to be settled respecting such situations.” (Cf. 2 Warren’s Heaton on Surrogate’s Courts, § 187, subd. 2, par. [g].)
*294 The burden of proof concerning this aspect is not less upon, the survivor under section 239 of the Banking Law than it is upon the proponent of a will. This was recognized in Matter of Yauch (270 App. Div. 348, affd. 296 N. Y. 585), where a deposit in the form of a joint account in the language of subdivision 3 of section 239 of the' Banking Law was required to be transferred to the executor, for the reason that the decedent had not knowingly or consciously changed her individual account so as to vest title in her son as survivor. The opinion in the Appellate Division distinguished Matter of Fenelon (supra) upon that ground.
There is no mechanical formula whereby the existence of a requirement can be measured or standardized to supply evidence additional to the factum in order to sustain this burden. Physical or mental weakness, although not so far advanced as to destroy competency entirely or under all circumstances, may be held to require, in the judgment of the trier of the fact, some proof additional to formal execution to establish knowledge of what she was doing when she signed the instrument. An invalid may retain enough strength of mind or body to consummate a simple transaction, but suffer complete mental lapse where circumstances conspire to becloud a complex one. This is such a situation. Here the misleading or disconcerting circumstance was not due to guile or self-seeking; nevertheless, the c.reation of these joint accounts had to be Mrs. Creekmore’s conscious and deliberate act, in order to render them valid, and unless she had capacity to appreciate the crucial difference between giving powers of attorney to Mrs. Rowland (which is what she did in the case of the Guaranty Trust Company) and establishing them as joint accounts, she was, in a legal sense, incompetent to create them. There is no simple rule by which all cases of this nature can be judged. Each stands, necessarily, in large degree, upon its own facts. The Emigrant and Franklin Savings Banks are not chargeable with fraud or undue influence, but if Mrs. Creekmore was confused or misled by her reliance upon their recommendations, so that these combined with her failing vitality to destroy her knowledge of what she was doing, the result is a nullity. It cannot be ignored that Mrs. Creekmore had confidence in these banks where she had kept the major portion of her property. She designed merely to give powers of attorney to her daughter, Mrs. Rowland, to draw on these *295 accounts to pay her personal bills, yet these banks in effect sent word that the way to accomplish her intended result was by creating joint accounts with Mrs. Rowland, instead of making Mrs. Rowland her attorney in fact. The nature of the transaction was different, but there is no reason to assume that Mrs. Creekmore understood this. She undoubtedly supposed that her banks were helping her to accomplish her purpose. The fact that she signed the signature cards through the instrumentality of Mr. Matthews, who had been her attorney, was a circumstance to be weighed by the trier of the facts. The mere circumstance that he attended her cannot be held as matter of law to have validated these transactions. Independent legal advice is always important, and under some circumstances may be controlling. Here, however, Mr. Matthews on that very morning started at Mrs. Creekmore’s request to get forms for powers of attorney, which would not have altered her testamentary plan, but he returned right away with signature cards for joint accounts instead. Meanwhile there had been no communication with Mrs. Creekmore. He simply did what the banks asked him to do. He testified that he was alone with Mrs. Creekmore during five or ten minutes before she signed. What happened, in other words, is that without previous manifestation of a change in intention, Mrs. Creekmore’s testamentary plan was overturned in a few minutes at the Lenox Hill Hospital at a time when she was very ill, and had to be aided in order to sign. It would be remarkable if in this short interval of time, and in her weakened state, she had suddenly decided to disinherit one daughter in favor of the other, for no reason insofar as appears, except that two of her banks thought that they would be safer with joint accounts instead of powers of attorney. There was sufficient evidence here to require Mrs. Rowland to prove more than merely that her mother signed these cards. The burden rested upon her of satisfying the court that her mother’s mind accompanied the act, that she knew what she was executing, and was cognizant of the provisions of these signature cards (cf. Weir v. Fitzgerald, supra). The Surrogate has found as a fact that Mrs. Rowland ‘ ‘ has not shown that the alleged joint accounts were knowingly and consciously created or sanctioned by her mother.” His findings have been affirmed in the Appellate Division’s order. The evidence was sufficient to create a question of fact upon this point within the juris *296 diction of the Surrogate to decide, and his decree should be reinstated.
The testimony of Mr. Matthews concerning the. professional advice which he gave to Mrs. Creekmore was correctly excluded. He stated that he and Mrs. Creekmore were alone at this time, that whatever conversations of this nature occurred were prior to her signing these instruments, and he was merely precluded from testifying to any legal advice which he- may have given to her upon this occasion. It was not until after these confidential communications had ended, that Mrs. Rowland and the notary re-entered the room when the documents were signed. Under the case of Rosseau v. Bleau (131 N. Y. 177, 183-184), testimony by Mr. Matthews would not have been privileged that he was instructed by Mrs. Creekmore to deliver these signature cards to the Emigrant and Franklin Savings Banks, but he was not interrogated concerning that. He was asked to state if he did [1] ‘ advise her of the legal effect ’ ’ of executing these forms. That is different from testimony that she signed them and told him to deliver them to the banks. The nature of the holding in the Rosseau case (supra, pp. 183-184) appears from the statement in the opinion that “ It has never been held that a verbal message communicated from client to attorney to be delivered to a third person cannot be proved in behalf of the person to whom the message was sent by the testimony of the attorney.” It would have been competent to prove by Mr. Matthews that his delivery of these signature cards to the banks was pursuant to Mrs. ■ Creekmore’s verbal instructions, but there can be no question that his prior legal advice to her (whatever it was) concerning the effect of these documents constituted a confidential communication which was inadmissible under section 353 of the Civil Practice Act. Rosseau v. Bleau merely holds that agency is not within the scope of a lawyer’s professional function, and consequently proof of agency does not constitute a communication within the statutory prohibition (cf. opinion by Bijur, J., in Matter of Howe v. Stuart, 68 Misc. 352 [App. Term, First Dept.]).
The order of the Appellate Division should be reversed and the original decree of the Surrogate’s Court reinstated, with costs in this court and in the Appellate Division, payable out of the estate.

. Upon the trial, respondent sought to elicit from the attorney whether during this conversation he advised her of the “legal effect” of the joint accounts, but the surrogate sustained appellant’s objection to the introduction of such testimony and it was not received.